**CONTINENTAL MARKETING CORPORATION, Appellant,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Appellee.**

**No. 9199.**

United States Court of Appeals
Tenth Circuit.

Dec. 26, 1967.

Lewis B. Kean and Earl Hightower, Los Angeles, Cal. (H. Byron Mock, Salt Lake City, Utah, on the brief), for appellant.

Richard M. Phillips, Assistant General Counsel (Philip A. Loomis, Jr., General Counsel, David Ferber, Solicitor, and Janet G. Feldman, Attorney, Securities and Exchange Commission, Washington, D. C., and Robert H. Davenport, Attorney, Securities and Exchange Commission, Denver, Colo., on the brief), for appellee..

Before MURRAH, Chief Judge, and PHILLIPS and LEWIS, Circuit Judges.

DAVID T. LEWIS, Circuit Judge.

Continental Marketing Corporation appeals from an order entered by the District Court for the District of Utah preliminarily enjoining the company from offering for sale and selling investment contracts for the "sale, care, management, replacement or resale of live beaver for breeding purposes," in violation of the anti-fraud provisions contained in Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. 240.10b–5. Continental is the sole appellant although the injunction was entered against seven business organizations and three named individuals found by the court to be acting in concert in the promotion and sale of unregistered securities. Noncompliance with the registration provisions of the Act is admitted and matters pertaining to fraudulent representations and use of the mails to effectuate sales are not in issue. The form of the injunction is not attacked. Continental's appeal questions only the finding that the company was engaged in the offer and sale of securities within the meaning of applicable federal laws.

■ Continental asserts that it is engaged exclusively in the brokerage of live beavers, organized for such purpose independently from all other defendants and in direct competition with some; that its contracts and services begin and end with the sale and delivery of live, specific and identified animals and that purchasers' reliance on the company extends no further. The company's formal contractual documents are in accord with this contention. Consequently, if the test of compliance with the compulsion of the Securities Act goes no further than an examination of organization and formal activity the subject injunction has been improvidently entered. Manifestly, the simple sale and delivery of live beavers do not, when viewed in isolation, constitute the sale of a security under the Act.

■ Appellant, however, does and must recognize that its vulnerability to the injunction allows judicial consideration of the overall concept of its contracts from inducement to formal consummation and beyond. "The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this (Securities Act). it is not inappropriate that promoters' offerings be judged as being what they were represented to be." S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344 at 352–353, 64 S.Ct. 120, at 124, 88 L.Ed. 88.

Appellant was organized in 1965 as a Colorado corporation and thereafter represented itself as an integral part of the organized domestic beaver industry. Its sales literature, couched in such glowing terms as "fabulous possibilities" and the "road to riches," presented to the prospective purchaser a history of the development of the beaver industry with specific reference to the activities, both past and present, of co-defendants and illustrated for the benefit of the purchaser a charted explanation of what was available in service after purchase of the beaver from appellant. The chart lines a sale of beaver from appellant (or either of two other defendant sales companies) to the owner purchaser. Thereafter the owner may care for his own animals with each pair of beaver requiring a private swimming pool, patio, den and nesting box together with the services of a veterinarian, dental technician, breeding specialist, etc. or the owner may choose to place his animals (at a cost of $6 per month per animal) with a professional

rancher who is a member of the defendant North American Beaver Association which in turn has available the technical assistance of two ranchers' service companies, also named defendants. All purchasers of beaver were encouraged not to take possession of the animals and although Continental made over two hundred sales in sixteen states, grossing over a million dollars, all who purchased from appellant elected not to take possession of their beavers and each contracted with one of the ranchers as suggested by appellant.

The history of the domestic beaver industry as represented to prospects by Continental and as revealed by the evidence taken at trial need only be briefly summarized. Prior to 1950, Mark Weaver, one of the defendants below, had successfully developed a small herd of domestic beavers and purportedly was "the first in the world to learn the secrets of the beaver" by discovering "the feed formula, the mating process, the pen design, [and] the other factors necessary to induce the beaver to reproduce in captivity." In an attempt to broaden the industry sufficient to establish a market for domestic beaver fur, a program was developed whereby members of the public were invited to invest in beavers. The investor could take up beaver ranching or ranch his beavers with Weaver or someone whom Weaver had induced to take up ranching. In any event the ranching was done under Weaver's expert supervision and Weaver provided many services incident to the domestic raising of beavers.

From an organization standpoint, the business was originally conducted through a sole proprietorship, next a partnership, and then through two corporations, one of which was, generally speaking, responsible for the selling activities and the other for providing the various services. Originally investors signed a single contract which contained the purchase terms, terms for care and breeding and a guarantee that there would be a 100 percent increase of the beavers during the first year. After

entry of a "cease and refrain order" with respect to the sale of investment contracts entered in November 1963, by the California Securities Commission, the purchasers of beavers entered into separate contracts for purchasing and ranching.

In 1965 three new companies, including appellant, were organized to take over the sales activities. This change came in the wake of an informal investigation by the Commission's staff and was apparently intended to accomplish compliance with regulations. The new companies involve principally the same people who were involved in the earlier organization. Chairman of the board and one of the three stockholders of appellant was a salesman in one of the earlier corporations and was one of the parties against whom the California "cease and refrain order" was issued.

In addition to the more commonly known securities, Section 2(1) of the 1933 Act, 15 U.S.C. § 77b(1), defines a security to include

"* * * any * * * certificate of interest or participation in any profit-sharing agreement * * * *investment contract,* * * * or, in general, any interest or instrument commonly known as a 'security,' * * *." (Emphasis added.)

The 1934 Act contains a similar definition in Section 3(a) (10), 15 U.S.C. § 78c (a) (10). The district court concluded that Continental was engaged in a common enterprise, the very heart of which was a chance to invest money through multiple contracts amounting in reality to an "investment contract" within the meaning of the applicable statute. The subject injunction is so founded and we hold it to be legally sound. In S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244, the Supreme Court gave approval to the state courts' practice of broadly construing the term "investment contracts" as a means of affording "the investing public a full measure of protection," and held that Congress in using the term in the 1933 Act had adopted such meaning "which had

been crystallized by this prior judicial interpretation." (at 298, 66 S.Ct. at 1103.) The Court went on to define an investment contract as

"a contract transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party * * *." (at 298–299, 66 S.Ct. at 1103.)

■■ The appellant points out that in *Howey* both the sales contract of a unit of a citrus grove and the contract for the care and management of the same were executed by the same promoter. We are urged, therefore, to hold that

"The judicial definition of the term 'investment contract' requires the investment in a common enterprise in which the investor is led to expect profits solely from the efforts of the seller or a third person *owned or controlled by the seller*." (Emphasis added.)

We do not think the element of ownership or control is essential. The better approach and the one which the Supreme Court in *Howey* noted was being employed by the state courts is to disregard form for substance and place emphasis on economic reality. The more critical factor is the nature of the investor's participation in the enterprise. If it is one of providing capital with the hopes of a favorable return then it begins to take on the appearance of an investment contract notwithstanding the fact that there may be more than one party or other than a principal party and his agent on the other end of the transaction or transactions. This accords with the views expressed by the Fifth Circuit in a case involving the sale of oil leases where a test well was to be drilled by a third party. The court said:

"The promoters were selling a chance to make a great deal of money from activities which were then, or would shortly be, carried on by persons other than the purchasers. In that setting it mattered not whether the test wells were to be drilled by the sellers, or by third persons either under, or independent of, their control." Roe v. United States, 5 Cir., 287 F.2d 435, 439.

See also S. E. C. v. Orange Grove Tracts, D.Mass., 210 F.Supp. 81, citing the Fifth Circuit *Roe* case.

■ The expressed and cited interpretation of the Securities Act amply covers the activities of appellant in the case at bar. Continental's appearance to the public, by design, was that of a representative of the domestic beaver industry, the growth and development of which was necessary to and would bring profit to investors. Purchasers were encouraged to leave their beavers at the ranches where they were located at the time of sale and where they would be "expertly housed, fed and otherwise cared for." They were advised that all they needed to do was buy the beavers, pay ranching fees and reap "geometric profits" as the beavers reproduced and the offspring sold. It was to be a "once in a lifetime opportunity" and "an opportunity to share in the profits of the breeding stock stage * * * the most lucrative stage in the development of the beaver industry." [1]

Investment by members of the public was a profit-making venture in a common enterprise, the success of which was inescapably tied to the efforts of the ranchers and the other defendants and not to the efforts of the investors. "[T]he royal road to riches," of which appellant spoke, could be traveled, if at all, only through the structure which

---

1. Evidence in the district court showed that defendants had sold beaver to investors for breeding purposes at prices that ranged between $2,000 and $6,000 and that defendants, including appellant, had represented that there was a market for live beavers at this price when, in actuality, live beavers could be purchased for as little as $20 and that no general market for live beavers in excess of $100 existed.

had developed from the embryonic state of the Weaver organization of the early 1950's. This structure into which investors entered was designed to obtain sufficient resources to produce enough domestic beavers to establish a market for its fur. If the structure collapsed then the purchasers would have little more than a bad investment. Certainly the beavers as mere animals and not as part of the enterprise did not have value consistent with the price many of the purchasers paid.[2] The economic inducement was the faith or hope in the success of the enterprise—the domestic beaver industry —as a whole, and not the value of the animals alone.

In this setting we hold that the transactions in question involved the sale of investment contracts and therefore "securities" within the meaning of the applicable acts and apply, with approval of the High Court, "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, supra, 328 U.S. at 299, 66 S.Ct. at 1103.

Affirmed.

2. See footnote No. 1, supra.