Richard D. AHRENS and Jeanne Ahrens, his wife, et al., Plaintiffs-Appellees,

v.

AMERICAN–CANADIAN BEAVER CO., Inc., a corporation, et al., Defendants-Appellants.

No. 71–1562.

United States Court of Appeals, Tenth Circuit.

April 18, 1972.

Rehearing Denied May 16, 1972.

Everett E. Dahl, Midvale, Utah, for defendants-appellants.

Alfred J. Schweppe, of Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle, Seattle, Wash. (Richard C. Dibblee, of Rawlings, Roberts & Black, Salt Lake City, Utah, and Kenneth E. Rekow, of Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle, Seattle, Wash., on the brief), for plaintiffs-appellees.

Before CLARK,* Associate Justice, and HILL and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This action was brought pursuant to the Securities Exchange Act of 1934 and the Securities Act of 1933. The 1934 Act is 15 U.S.C. § 78j(b). The Act of 1933 is 15 U.S.C. § 77q(a). However, the case was tried and submitted to the jury under Rule 10B–5, promulgated pursuant to the 1934 Act. The security involved is a beaver investment contract which has heretofore been held to be a security by this court.[1]

This particular case has been appealed to this court once before. At the prior trial a jury verdict was in favor of the defendants, but was reversed because of the trial court's action in submitting to the jury the question whether an investment contract was a security, and, secondly, because of errors in the trial court's charge to the jury. On that appeal this court ruled that the investment contract in beavers was a security. The relief sought at the instant trial was rescission of amounts paid to the defendants, the jury again returning verdicts in favor of defendants. The trial court, which had reserved its ruling on the plaintiffs' motion for directed verdict, entered judgments in favor of each of the plaintiffs for judgment notwithstanding the verdict.

The question before us is whether the trial court erred in granting the several judgments in favor of the plaintiffs notwithstanding the verdicts.[2] In entering the judgments the trial court noted that the only questions reserved in the stipulated pretrial order were whether the defendants made or induced any sale of beaver to the plaintiffs; what misrepresentations of material fact were made; whether the plaintiffs relied on the misrepresentations; and if there were such misrepresentations, when in point of time the defendants had knowledge or should have had knowledge of any such misrepresentations. The court concluded that the evidence was clear that the plaintiffs were victims of false representations and omissions in the purchase of their securities for which the defendants were responsible.

The defendants against whom these judgments were entered were American-Canadian Beaver Co., Inc., a corporation, Ted L. Weaver, Mark L. Weaver and Van R. Weaver. The three individual defendants were members of the same family, Mark Weaver being the father and the other two being sons. Mark L. Weaver was the founder and leader of the enterprise and architect of the plan. There were several others named in the original suit, but these verdicts were not disturbed in the court's order. At the trial the several plaintiffs testified and, in addition, called Van Renor Weaver as an adverse witness. The only witness on behalf of the defendants was the father, Mark L. Weaver, and due to the fact that his memory was short on details he contributed little. In addition, the record contains numerous exhibits, including correspondence and literature.

The defendants operated a beaver ranching organization which included numerous ranches located in various places in the Western states. The literature represented this to be a livestock operation which would be conducted by the American-Canadian Beaver Co., Inc. The plan further called for the investors to own the livestock, which was identi-

---

* Associate Justice, United States Supreme Court, Retired, sitting by designation.

1. Continental Marketing Corp. v. S.E.C., 387 F.2d 466 (10th Cir. 1967).

2. The amounts involved are as follows:

| To Richard D. Ahrens and Jeanne Ahrens | $ 9,973.06 |
| To James H. Evans and Della Evans | 11,912.16 |
| To W. M. Lennox and Emma Lennox | 5,478.92 |
| To Franklin E. Metz and Amy Metz | 11,720.30 |
| To Lloyd G. Thomas and Evelyn Thomas | 13,428.10 |
| To Melvin Winther | 12,273.58 |
| To A. E. Carlin and Violet M. Carlin | 7,810.58 |

fied as being the property of particular purchasers; the defendants would build up the herd over a period of years until such time as there were many thousand animals available for sale to the public for pelts and other by-products. From the literature it is also to be gleaned that the defendants had particular and secret expertise in domesticating, raising and caring for these animals. It was represented from oral as well as written statements that:

1. The animals sold were derived from selected wild beaver which had in 1950 been purchased in Northern Canada and placed in pens in Squirrel Meadows, Wyoming.

2. The operation was a tax exempt cooperative. The tax advantages of livestock growing—this being a species of it—were also stressed.

3. Expressly and implicitly, the investments which were made in the live beaver would multiply in steady progression—this being due to diet plus ideal breeding environment.

4. Investors were guaranteed 100 percent cash return of investment plus four and one-half percent interest and replacement of casualties from death or other causes.

Although specifically denied by defendants, the plan had a chain letter aspect in that the early investors could recover their investment because new purchasers were coming in. But as the demand for beaver contracts diminished, sale or return became more difficult. As a consequence, when the plaintiffs sought to recover their investments it became necessary to file actions in order to obtain a recovery.

The plaintiffs became involved in the beaver business through various means, but ordinarily by salesmen for the Weaver organization. There followed from this a meeting with one or more of the Weavers. Sometimes this took place in the home of the particular plaintiff. Other times it would be at a meeting place at which a number of potential investors were present. At these meetings an expansive talk was given; it was represented that Mark Weaver and his sons had developed over a period of years great expertise in the handling and raising of beavers, and, in fact, were the only people in the world capable of raising beavers in captivity; that they had a special secret food formula which assured good reproduction; that their breeding methods had over a period of years produced particularly large beavers with excellent pelts; that there was a good resale market; and that each investor would always be able to get his money back if he wished since Mark Weaver controlled the market. Each plaintiff stated that he had examined the pamphlet which has been referred to here and which is marked Plaintiffs' Exhibit No. 5.

The evidence showed that many of the beavers were wild and had been newly introduced to the herd. The number was variously estimated as from 7,000 to 11,000. Some of the wild beavers were sold directly to investors. The cost price of wild beavers was from $80.00 per pair to $800.00 per pair, including license and transportation, but the plaintiffs paid $2,400.00 per pair. Evidence at the trial also established that the reproduction rate was far from the numbers represented. In fact, 66 percent of the beavers had no reproduction whatsoever. When the plaintiffs sought to sell their animals they discovered that there was no market from either the Weavers or the public. Some of the plaintiffs did not attempt to sell because it was clear from the experiences of others that it would have been a futile exercise.

As observed, most of the evidence in the case was unrefuted. No doubt it was this factor which moved the trial court to enter judgment notwithstanding the verdict. The basic issue which we are called upon to determine, then, is whether the evidence is overwhelmingly in favor of the plaintiffs and thus whether there can be but one reasonable conclusion as to a proper judgment. We are of the opinion that the trial court

was correct in its ruling and that it would have been fully justified in granting plaintiffs' motion for directed verdict at the conclusion of the evidence since the elements of the several claims are shown by the record to have been clearly and unequivocally established.

A cause involving the Weavers first came before this court in 1967 in Continental Marketing Corp. v. S. E. C., 387 F.2d 466 (10th Cir. 1967). There the contention of the Weavers was that they had been engaged exclusively in the sale or brokerage of live beavers. The trial court had enjoined the defendants from selling investment contracts in violation of the Securities Exchange Act of 1934 and the Securities Act of 1933. The Continental Marketing Corp. was one of the Weavers' business associations and had substantially the same people and the identical plan of operation as that before us here. Based on the decision of the Supreme Court in S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), this court ruled that the defendants were engaged in the sale of securities, and the fact that the underlying assets were beavers did not detract from the investment contracts being securities. It was said:

> In this setting we hold that the transactions in question involved the sale of investment contracts and therefore "securities" within the meaning of the applicable acts and apply, with approval of the High Court, "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey,* supra, 328 U.S. at 299, 66 S.Ct. at 1103. 387 F.2d at 471.

More recently this court reviewed a judgment having to do with the identical parties and issues which are now before us in Ahrens v. American-Canadian Beaver Co., 428 F.2d 926 (10th Cir. 1970). In the course of that opinion remanding for a new trial the court referred to the representations of defendants relative to the market of beavers as breeding stock, the origin of the beavers sold, the reproduction rate and the care that would be given to them. The court also mentioned the fact that the Weavers had refused to repay the purchase price, and, further, it was ruled that the defendants were responsible for the statements of their agents.[3]

The Sixth Circuit in Kemmerer v. Weaver, 445 F.2d 76 (6th Cir. 1971), also had occasion to consider the question as to whether the defendants were controlling persons in that they controlled the sale of investment contracts and the management of the beavers. Mark L. Weaver, Ted L. Weaver and Van Weaver were involved in that suit also. In the course of its opinion upholding the plaintiff's favorable judgment it was said:

> Instead of selling exclusively domestic beaver, defendants actually sold to plaintiffs and others, certain wild-trapped beaver which ranged in actual market value of from $20 to $75 each. Furthermore, there was no immediate market for resale as had been promised by defendants. Many purchasers were placed upon a one-year waiting list. 445 F.2d at 78.

The unrefuted testimony in this case establishes that the defendants were using the mails or instrumentalities of interstate commerce in the sale of a security and, further, that they were making use of a manipulative or deceptive de-

---

3. On this it was said:
   * * * The record contains many statements made by several salesmen employed by the defendants, or some of them, to sell the beaver contracts. There is no question but that the salesmen were agents of their employers, and the plaintiffs were entitled to an instruction on the employers' responsibility for such statements. It was error not to have instructed on this issue.
   428 F.2d at 928.

vice. See Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965). It is clear beyond doubt that the plaintiffs believed that they were getting domesticated beaver, whereas in fact thousands of wild beaver were being introduced into the herd at large profit to the defendants. All of this was with full knowledge of the defendants.[4] It is equally clear and unrefuted that the plaintiffs, notwithstanding guarantees contained in the literature, could not sell or otherwise recover their investments. Moreover, the evidence as a whole establishes that the pattern of this plan was one in which only the operators could profit, whereas the investors, particularly those coming in relatively late in the game, were doomed to suffer substantial loss. Thus, the evidence reveals the scheme or device to defraud as being based on pretense as to the source of the beavers, their value, and knowledge as to their productive qualities—knowledge which did not exist. The beavers were the lure, and the mystery surrounding their sex lives and habits was fully exploited in obtaining the plaintiffs' money.

■■ We are mindful that the trial court should grant a judgment n. o. v. only in the clearest of cases. The court is bound to consider the evidence in a light most favorable to the party against whom the motion is directed, and if after a fair and impartial judgment it reaches different conclusions, such a judgment should not be entered. In order to support this action on the part of a trial court, the evidence must be overwhelmingly in favor of the party in whose favor the trial court enters it. Derr v. Safeway Stores, Inc., 404 F.2d 634 (10th Cir. 1968); Gulf Ins. Co. v. Kolob Corp., 404 F.2d 115 (10th Cir. 1968); C. H. Codding & Sons v. Armour & Co., 404 F.2d 1 (10th Cir. 1968); Chicago, Rock Island & Pacific Railway Co. v. Howell, 401 F.2d 752 (10th Cir. 1968); Kippen v. Jewkes, 258 F.2d 869 (10th Cir. 1958). See also 5A Moore's Federal Practice § 50.07 [2] (1971 Ed.).

■ The action of the trial court under these particular facts is fully understandable. The overwhelming weight of the evidence supported the conclusion that the plaintiffs were the victims of knowing deception and that the verdict was out of harmony with a great preponderance of the evidence. It would have been grossly unjust to have entered judgments on the verdicts.

Finally, the defendants guaranteed that the plaintiffs could obtain a cash return of investment and, therefore, a judgment giving effect to this constitutes substantial justice.

The judgment of the district court is affirmed.

---

4. Plaintiffs' Exhibit PX 38, a letter from Ted Weaver to a salesman, Delmar Baker, evidences awareness of the falsity of the pretense that the animals being sold were domesticated:

> Dell, I think that you would do well to not mention to everyone that you sell that we add wild beaver to our stock unless they bring up the subject, and then I would not make a big issue of it but just explain the need for keeping the blood lines from getting to [sic] closely related. As we get more and more beaver, we will naturally want to cut out all such additions. We both know that the reason they would ask at all is their worry that we might buy wild beaver and sell them to them at a profit. Also they need reassuring that other owners are able to sell their young that they raise; therefore, it is well to answer that the beaver being sold now are those sold off by other owners who have raised them and are now beginning to take some of their money out.