Elton M. MOORE, Appellant,

v.

Walt SHULTZ, d/b/a Walt Shultz Equipment Company, and McGraw-Edison Company, Appellees.

No. 72-1845.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 24, 1973.

Decided Jan. 23, 1974.

Rehearing Denied March 13, 1974.

William S. Dorman, Tulsa, Okl. (James R. Eagleton, Tulsa, Okl., of counsel, with him on the brief), for appellant.

Jerry J. Dunlap, of Dunlap, Laney, Hessin & Dougherty, Oklahoma City, Okl. (Charles F. Lind and Charles A. Prudell, Elgin, Ill., of counsel, with him on the brief), for appellees.

Before SETH and HOLLOWAY, Circuit Judges, and LARAMORE, Senior Judge, United States Court of Claims.*

SETH, Circuit Judge (By reassignment from Holloway, Circuit Judge).

This is an action for an injunction and damages for infringement of plaintiff's patent. Defendant, McGraw-Edison Company, manufactures the allegedly infringing machine, and defendant, Walt Shultz, sells it.

Defendants deny infringement, and raise the defenses of invalidity of plaintiff's patent and of laches.

The case was submitted to the jury on ten interrogatories covering plaintiff's cause of action and the defenses. The jury found for the plaintiff in its answers to each of the ten interrogatories. However, some time later, the court entered judgment notwithstanding the verdict in favor of defendants, and ordered that in the event the judgment n. o. v. was reversed on appeal, there would be a new trial.

The devices involved in this action are known in the dry cleaning business as "pants toppers," and are used for finishing and pressing the upper portions of men's trousers after they have been dry-cleaned. The operation generally involves fitting the waistband of the trousers around an adjustable form and applying steam and hot air in sequence to remove the wrinkles. The legs of the trousers are then pressed in a second operation.

Some time in the late 1940's plaintiff Moore began to formulate a plan for an improved pants topper. It was not until 1953, however, that he felt that he had developed the model for a successful machine. In April of that year he contacted a patent attorney and his application was filed on December 9, 1953. He ob-tained a patent approximately two years later in November 1955 (No. 2,723,785). While his application was pending, he began negotiations for the manufacture and sale of his machine under a license, and in January 1956 a licensing agreement with P & H Industries, Inc. was executed. In the following seventeen months P & H Industries manufactured approximately 440 machines and paid Mr. Moore royalties of about $11,000.00. The agreement was terminated at the request of P & H Industries in May 1957.

After terminating the agreement with plaintiff, P & H Industries continued to manufacture a pants topping machine. Defendant McGraw-Edison entered the field under an agreement with P & H Industries in 1961 which allowed a subsidiary to manufacture the P & H machine. Although this agreement has since terminated, McGraw-Edison has continued to manufacture its modified version of the P & H machine. This is the Ajax machine asserted to infringe upon plaintiff's patent.

Plaintiff apparently knew that P & H continued manufacturing topping machines after it had terminated the licensing agreement with him, but he relied on assurances that his patent was no longer involved. He first saw the McGraw-Edison topper in June 1967, although he had seen it advertised previously. Soon thereafter he contacted his attorneys who promptly notified McGraw-Edison of the possible infringement. Suit was not filed, however, until 1970, apparently because Mr. Moore was occupied in other litigation involving his patent.

*The Moore Pants Topper:*

The controversy focuses on claim 1 of plaintiff's patent, the Moore patent, which reads:

"A machine for finishing the top portion of trousers comprising a frame member having a plurality of reciprocable slide members mounted

* Sitting by Designation.

thereon, a foraminous bag carried by said frame member and surrounding said reciprocable slide members, means for moving the slide members outwardly to expand the bag member into engagement with the inner surface of the trousers top, a perforated tube assembly supported by said frame member and centrally disposed thereof, means for supplying steam to said tube assembly, and means supplying heated dry air to the trousers top."

We are particularly concerned with the combination and cooperative effect of the foraminous (porous) bag, the slide members, of which there were four shown in the Moore patent diagrams, and the means for causing the slide members to move outwardly, thus expanding the bag and engaging the waistband of the trousers. In the Moore patent diagram the slide members were controlled by a spring mechanism operated by a foot pedal. It should also be noted at this point that Mr. Moore does not assert that any of the elements of his invention taken individually was unknown in the prior art or would be patentable by itself. Rather, he asserts that his invention is a patentable combination of elements, which, although known previously individually, produce new or improved results in concert.

### The Prior Art:

Three prior patents were cited by the examiner in the course of processing plaintiff's application. Newhouse patent No. 2,469,742 is a device for pressing the sleeves of coats, jackets, and other garments after cleaning.

Although not incorporated in the patented device, use of a fabric bag is discussed in connection with the prior art and discarded as having unfavorable limitations. Bader et al. patent No. 2,531,599 is called a pants stretcher and is designed to restore the size of shrunken pants or trousers. It basically consists of two bucks over which each leg of a pair of pants would be drawn. Both the Newhouse and the Bader patents contemplate the application of steam or hot air. Finally, Rosenthal patent No. 2,658,649 was also cited. This is a pants pressing machine designed to perform a similar function to the Moore machine only with respect to laundered rather than dry-cleaned pants. It involves an expandable, heated center form over which the upper portion of a pair of pants could be placed for drying and pressing. The patent indicates the form can be used to suspend the pants either horizontally or vertically.

In addition to the patents cited by the examiner, defendants introduced three uncited prior patents with the intent of thereby demonstrating the obviousness of or lack of novelty in the Moore device. These patents are Egleston No. 176,172, Bowen No. 2,428,484, and Littell No. 2,521,297. The Egleston device is an apparatus for shaping trousers and suggests the use of a wire form over which the trousers would be placed. Both the Bowen and the Littell machines are specifically designed as pants toppers. Both envision the application of steam and hot air, and both employ an adjustable means for engaging the upper portion of the trousers. The Bowen device suspends the trousers vertically although certain manual operations are required initially. It does not envision the use of either the reciprocable slide mechanism or the foraminous bag taught by the Moore patent. The Littell device holds the trousers horizontally and uses the force of the hot air to further expand the upper portion. It also does not employ a reciprocable slide mechanism to engage the waistband, and although the patent discusses the possible use of a foraminous bag, it rejects it as having many undesirable effects.

### The O'Boyle Machine:

At approximately the same time that Mr. Moore was developing his pants topper, Kenneth O'Boyle in Albuquerque, New Mexico, was also working on a device to perform a similar function. Mr O'Boyle filed his patent application approximately four months prior to Mr. Moore's, but received his patent approxi-

mately three weeks after Mr. Moore's had been granted. Both applications were processed by the same examiner.

Mr. O'Boyle had constructed experimental prototypes of his machine and used them in the dry-cleaning establishment in which he worked as early as 1951. He did not, however, realize a model which worked to his satisfaction until early 1953. Although one of the distinctive features of the O'Boyle machine as described in the patent is its ability to process two garments simultaneously, its design and operation bear some resemblance to the Moore topper. Perhaps the most obvious similarity is the use of a porous bag over which the trousers are drawn, and the fact that the bag can be collapsed or expanded by an adjustable mechanism. However, rather than the four slide members shown in the Moore patent which are moved back and forth mechanically by a spring mechanism to expand and collapse the bag, the O'Boyle topper employs a lever mechanism pivoted by hand, which moves in relation to a stationary buck. Such a mechanism would of course move in a circular rather than a reciprocable fashion.

The record also indicates that Mr. O'Boyle made certain disclosures regarding his machine to American Laundry Machinery Company, a McGraw-Edison subsidiary, while his machine was still in experimental stages. These disclosures apparently suggested the possible use of a slide mechanism rather than the lever device to expand the foraminous bag. American Laundry retained these disclosures in its files and they were never published nor was any machine ever constructed pursuant to the drawings which they contained.

*The Ajax Press*:

With some modifications, the American Laundry Machinery Company, a subsidiary of McGraw-Edison, has continuously manufactured the Ajax topper since 1961 when it entered the agreement with P & H Industries, Inc. Although its outward appearance bears little resemblance to the drawings contained in the Moore patent, it incorporates the essential features of the Moore claim. There are, however, two principal features which defendants insist distinguish it from the Moore topper. As previously mentioned the Moore patent suggests the use of four reciprocable slide members all of which are movable. (It should nevertheless be noted that the disputed claim refers only to "a plurality of reciprocable slide members."). The Ajax topper on the other hand uses a stationary buck in connection with only one slide member. Mr. Moore contends, with the support of expert testimony, that such a mechanism "reads" on his patent claim, *i. e.*, "plurality" requires only that there be more than one, and while the buck on the Ajax topper is stationary, it and the slide nevertheless move relative to each other. The second asserted difference is the use in the Ajax topper of a compressed air cylinder to operate the slide as opposed to the spring device suggested in the Moore patent. Here again the plaintiff's expert was able to read the air cylinder device on the Moore claim.

As stated above, the issues raised by both parties were submitted to the jury by ten interrogatories. They are as follows:

"(1) Do you find that the Defendants have proved from clear and convincing evidence that the claim in issue of the patent in suit does not particularly point out and distinctly claim the subject matter which Moore regarded as his invention?

"(2) Do you find from clear and convincing evidence that the difference between the subject matter of the claim in issue of the patent in suit and the prior art are such that the subject matter thereof as a whole would have been obvious at the time the alleged invention thereof was made to a person having ordinary skill in the art to which said subject matter pertains?

"(3) Do you find from clear and convincing evidence that the claim in

issue of the patent in suit is not 'new' within the meaning of that word as used in the patent law?

"(4) Do you find from clear and convincing evidence that the subject matter of the claim in issue of the patent in suit was in public use more than one year prior to the filing date, December 9, 1953, of the patent in suit?

"(5) Do you find from clear and convincing evidence that the subject matter of the claim in issue of the patent in suit was known or used by others in this country before the invention thereof by Moore?

"(6) Do you find from clear and convincing evidence that the subject matter of the claim in issue of the patent in suit was patented or described in a printed publication more than one year prior to the date of the application for the patent in suit, namely, December 9, 1953?

"(7) Do you find from clear and convincing evidence that the subject matter of the claim in issue of the patent in suit was, before Moore's invention thereof, invented in this country by another who had not abandoned, suppressed or concealed it?

"(8) Do you find from a preponderance of the evidence that the Ajax Pants Topper infringes the claim in issue of the patent in suit?

"(9) Do you find from a preponderance of the evidence that Moore delayed unreasonably in contending that McGraw-Edison infringed the patent in suit?

"(10) Do you find from a preponderance of the evidence that McGraw-Edison did not have a 'regular and established place of business' (within the meaning of the statute quoted in Instruction No. 14A), in this Judicial District at or before the time this case was filed against McGraw-Edison, namely March 31, 1970?"

Neither party on this appeal attacks the content nor the wording of the inter-

rogatories, no objections were made to them by the defendants at trial, and it is not asserted that any of them contained issues not proper for the jury's determination. The standards for review of judgments n. o. v. were set out by this court in Kippen v. Jewkes, 258 F. 2d 869 (10th Cir.), and more recently in United States v. Fenix & Scisson, Inc., 360 F.2d 260 (10th Cir.); Wilkin v. Sunbeam Corp., 377 F.2d 344 (10th Cir.). This standard which we have said is to be applied to both judgments n. o. v. and to directed verdicts is that the evidence must be viewed in the light most favorable to the party opposing the motion (together with inferences which may be fairly drawn therefrom), and the verdict not directed nor the motion granted unless the evidence points all one way, and is susceptible of no reasonable inferences which sustain the position of the party against whom the motion is directed. The motion must also be denied if the evidence and the inferences, so examined, are such that reasonable men may reach different conclusions. Kippen v. Jewkes, 258 F.2d 869 (10th Cir.).

█ The responses to each interrogatory were favorable to the plaintiff's position. The plaintiff had the burden of proving by a preponderance of the evidence that his patent had been infringed by defendants. This issue was submitted to the jury in the eighth interrogatory, and the jury found infringement. The first seven interrogatories were submitted in response to the defendant's assertion that plaintiff's patent was invalid. As to these defenses, the defendants had the burden of proof and this was a burden to prove by "clear and convincing" evidence as the interrogatories recite. The ninth interrogatory was based on a defense of laches, with the burden on defendant to establish it by a preponderance of the evidence.

█ Thus we must examine the record under the standard above set out for judgments n. o. v.; and, of course, considering who had the burden as to

the several elements, and what the burden was. Each element must be considered separately. We have heretofore held that it is an exceptional case wherein the party having the burden of proof is entitled to a judgment n. o. v. Ahrens v. American-Canadian Beaver Co., 458 F. 2d 607 (10th Cir.); Kirkendoll v. Neustrom, 379 F.2d 694 (10th Cir.); Powers v. Continental Casualty Co., 301 F.2d 386 (8th Cir.). See also 5A Moore's Federal Practice ¶ 50.02[1].

Since the attacks on the validity of this patent became the center of the trial, as might be expected, the issues advanced by defendants are first considered. As stated above, the burden as to the issues in the first seven interrogatories was on the defendant; furthermore, the burden was heavy—clear and convincing evidence. It is easy to lose sight of the degree of this burden, but it must be imposed, and the reason for it is important.

Plaintiff Moore holds a United States patent protecting his pants topping machine. This was issued in due course, and it is advanced by him as a valid combination patent in the allegations of his complaint. Thereby a presumption arises in favor of its validity. The defendants can overcome that presumption and establish the invalidity of the patent only upon clear and convincing evidence. Griswold v. Oil Capital Valve Co., 375 F.2d 532 (10th Cir.). In McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381 (10th Cir.), we applied the following test for a valid combination patent:

"The test of whether a particular patent is a mere aggregation and invalid or a combination and valid has been variously stated. Generally, where elements old in the art are united in such a way that a new and useful result is secured or an old result is attained in a more facile, economical and efficient manner, there is a patentable combination."

The first seven interrogatories are addressed particularly to several conditions asserted by defendants to make the patent invalid. In the first interrogatory the jury was asked whether the defendants had established that the claims of the plaintiff's patent did not distinctly claim and particularly point out the subject matter of the invention. As to the nature and quality of the claim, there was testimony submitted by both parties. The record demonstrates that the evidence submitted by the plaintiff on this point in the context of the degree of the burden was a sufficient basis for the jury to have answered as it did.

The interrogatories two through seven submit the other particular reasons advanced by defendants to show the plaintiff's patent to be invalid. These include, as a reference to the interrogatories will show, obviousness, lack of novelty, prior public use, prior knowledge, prior publication, and prior invention. The defendants had the burden of proof by clear and convincing evidence as to each. They attempted to carry this burden by introducing the uncited prior art, the O'Boyle patent, the prior use of the O'Boyle machine, and the disclosures made by Mr. O'Boyle to American Laundry Machinery Company. While these facts are indeed significant as to the validity of the Moore patent, they fail to disprove it with the degree of certainty defendants were faced with. The defendants' own witnesses were unable to testify that the uncited prior art was any more pertinent than that cited by the patent examiner or that the O'Boyle machine contained the essential elements of Mr. Moore's topper. Furthermore, there is strong evidence that the O'Boyle disclosures were made only in confidential communications with American Laundry. Finally there is the consideration that both the O'Boyle and Moore patents were approved by the same examiner. Thus there was submitted evidence on both sides of each issue or element. On balance we find ample support for the jury responses to interrogatories one through seven, and again, in view of the heavy burden of persuasion upon the defendants.

It must be held that as to each of the elements of the defense directed to the validity of the patent, the defendants failed to carry their burden. Further,

when the standards relating to review of motions for judgments n. o. v. are considered, it becomes apparent that the determination of the jury, as to the several issues relating to validity, must be reinstated.

■■ Before leaving the elements of validity, and in view of the point raised by the plaintiff that the trial judge should have been disqualified by reason of a statement he made as to the degree he would be bound by the answers of the jury, we must refer to several decisions: It is clear that the ultimate question of validity of a patent is one of law. A. & P. Tea Co. v. Supermarket Corp., 340 U. S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). "Validity" is a legal conclusion arising from the issues raised in attacks on a patent and more importantly is derived from the several components of validity. These include novelty, utility, and non-obviousness (invention). Of these three, the first two, novelty and utility, are customarily considered to present issues of fact. We have so held. A. E. Staley Manufacturing Co. v. Harvest Brand, Inc., 452 F.2d 735 (10th Cir.); Scaramucci v. Dresser Industries, Inc., 427 F.2d 1309 (10th Cir.). There is, however, some confusion or difference of opinion as to the non-obviousness element. The Supreme Court has observed that this matter "lends itself to several basic factual inquiries", and compared it in that respect to concepts of negligence and scienter. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Although the Fifth and Ninth Circuits have taken a different view, we have held those observations to mean that non-obviousness is itself a factual question. Eimco Corp. v. Peterson Filters & Engineering Co., 406 F.2d 431 (10th Cir.); *contra* Swofford v. B & W, Inc., 395 F.2d 362 (5th Cir.); Hensley Equipment Co. v. Esco Corp., 375 F.2d 432 (9th Cir.). Thus, within the Tenth Circuit, novelty, utility, and non-obviousness are held to require factual determinations.

Passing to issues other than validity of the patent, the eighth interrogatory, as noted above, presented the infringement issue. Here the plaintiff, of course, had the burden to show infringement by a preponderance of the evidence. The issue was so submitted to the jury which found there had been infringement on the part of defendants by the Ajax machine. The issue was narrowed to infringement by equivalency.

In McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381 (10th Cir.), we considered a claim of infringement by equivalency. We listed the following considerations for determining its applicability:

"The question of equivalency is one of fact and it must be determined against the context of the patent, the prior art and the particular circumstances of the case and consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients and the function it is intended to perform."

As previously noted, plaintiff's expert testified that the air cylinder operated slide and stationary buck of the Ajax topper are, in his opinion, functional equivalents of the mechanically operated slides of the Moore topper. If accepted by the jury, this testimony would furnish a reasonable basis for a finding of infringement. The considerations suggested above received adequate attention during the presentation of evidence, in the instructions, and are adequately reflected in the response to the eighth interrogatory. There was evidence before the jury to support its answer to the eighth interrogatory.

■■ The final contested issue relates to the ninth interrogatory which raises the issue of laches. Here again the defendants had the burden of persuasion, although only by a preponderance of evidence. We again find in the record sufficient support for the jury's determination that there was no undue delay or prejudice to the defendants. The inference may be drawn from the record that plaintiff did not become aware of the possible infringement until

1967, and that any ensuing delay in filing suit was due to other pending litigation testing the validity of his patent. Furthermore, McGraw-Edison was promptly notified by Mr. Moore of the alleged infringement soon after he saw the Ajax machine of defendants. Such circumstances are sufficient excuse for the delay. Clair v. Kastar, Inc., 148 F. 2d 644 (2d Cir.), cert. denied sub nom. Kastar, Inc. v. Clair, 326 U.S. 762, 66 S. Ct. 143, 90 L.Ed. 459 (1945).

In view of the foregoing, we must set aside the order of the trial court which granted judgment n. o. v., and this we hereby do.

 There remains for consideration the alternative order of the trial court granting a new trial. It is possible that some of the basis for this order lies in a response made by the plaintiff during his testimony which indicated that he had first conceived of his pants topping machine about 1948. However, both parties agree that this testimony alone is insufficient to establish a priority date, and that the earliest date from which the plaintiff can claim his invention is April 1953 when he first contacted his patent attorney. The defendants requested an instruction to this effect, which the court agreed to give, but which apparently was omitted.

We conclude also that the failure to give the requested instruction relative to the above date was harmless error. Mr. Moore's statement as to when he got his basic idea was made during the course of his general testimony. There is no indication that undue attention was ever drawn to it nor emphasis placed on it. The court observed that it had failed to notice the statement, and that it considered it unlikely that the jury had either. A special instruction in such a situation was not called for, especially in view of the court's observation.

The order for a new trial states as grounds therefor that the evidence was insufficient to support the jury's answers to the interrogatories, and that those answers were against the weight of the evidence. We have already stated our conclusion when the burden of proof is considered and the standards applied for judgment n. o. v.

With further reference to the grant of a new trial in the event the judgment n. o. v. was set aside on appeal, we recognize that the grant of a new trial is normally within the discretion of the trial court, and an unusual situation must be presented before such a motion will be overturned. However, the error in this case resulted from an overlapping of the functions of the judge with those of the jury. Both parties have indicated that all available evidence was presented at trial, and that a second trial would basically be a repetition of the first. The jury heard all the evidence the parties had, and we conclude that a new trial of this case would serve no purpose, and should not be granted. O'Neil v. W. R. Grace & Co., 410 F.2d 908 (5th Cir.). The order granting a new trial in the alternative is hereby set aside.

The judgment and order are reversed, and the case remanded with instructions to enter judgment on the verdict, and for such other proceedings as may be necessary not inconsistent herewith.