263 So.2d 835 (1972)
Thomas W. FRYE, Appellant,
v.
Norman W. TAYLOR, Appellee.
No. 70-952.
District Court of Appeal of Florida, Fourth District.
March 9, 1972.
*836 J. Russell Hornsby and Dale E. Anstine, of Law Offices of J. Russell Hornsby, Orlando, for appellant.
No appearance for appellee.
MAGER, Judge.
Defendant appeals a final judgment entered in favor of the plaintiff on a suit to enforce a promissory note.
Defendant executed the note to secure a loan of $2,500.00 made by the plaintiff to enable defendant to purchase a directorship in Koscot Interplanetary, Inc. Defendant contends that the note in question is void and unenforceable since it was given in consideration of participation in a transaction declared to be a lottery under Section 849.091, Florida Statutes, F.S.A. In addition, defendant counterclaimed for the return of $2,000.00 previously paid for the obtaining of a supervisor position in Koscot alleging that such payment was in violation of Chapter 517, Florida Securities Law.[1]
From our review of the evidence in the record we are of the opinion that the transaction in question unmistakably and as clearly as the proverbial "nose on the face" constitutes a lottery within the spirit and letter of F.S. Section 849.091, F.S.A. and that the note sued upon for participation in such illegal transaction is void and unenforceable. M. Lippincott Mortgage Investment Co. v. Childress, Fla.App. 1967, 204 So.2d 919.
The evidence in the record reflects an ingenious scheme of "pyramid franchising" agreements embracing multi-level membership recruitments with the payment of finder's fees for membership recruitment and "advancement" within the various levels of such plan. The evidence further demonstrates that the motivating factor inducing persons to become participants was not the sale of cosmetics but rather the receipt of a fee or commission through a chain process of securing membership.
F.S. Section 849.091, F.S.A., sets forth the type of "pyramid club" or "chain letter" which constitutes a lottery:
"849.091 Chain letters, pyramid clubs, etc., declared a lottery; prohibited; penalties.  The organization of any chain letter club, pyramid club, or other group organized or brought together under any plan or device, whereby fees or dues or anything of material value to be paid or given by members thereof are to be *837 paid or given to any other member thereof, which plan or device includes any provision for the increase in such membership through a chain process of new members securing other new members and thereby advancing themselves in the group to a position where such members in turn receive fees, dues or things of material value from other members, is hereby declared to be a lottery, and whoever shall participate in any such lottery by becoming a member of, or affiliating with, any such group or organization or who shall solicit any person for membership or affiliation in any such group or organization shall be guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than one hundred dollars, nor more than five thousand dollars, or by imprisonment in the county jail for a period of not more than two years or in the state penitentiary not less than one year nor more than ten years." (Emphasis added.)
It is difficult to discern any distinctive difference between the scheme giving rise to the debt in question and the prohibited chain letter or pyramid transaction set forth in Section 849.091. The transaction in the case sub judice is ingenious because its survival is dependent upon a combination of operative simplicity, financial complexity and the basic human desire to "make a fast buck". It is a lesson in psychological motivation and character study the likes of which would bring an envious smile on the face of P.T. Barnum. Under the Koscot "plan" there are four basic levels of participation: beauty advisor (retailer); coordinator (retail manager); supervisor (wholesaler); and director (wholesale manager). Each position requires an investment to be made by the participant. In the case of a person ascending to the supervisor level, it is necessary to pay Koscot $2,000.00; in the case of a person ascending to the highest level of director it was necessary to pay Koscot $2,500.00. The person "sponsoring" a participant for the supervisor or director level receives a "finder's fee". In the case of a supervisor sponsoring another person to become a supervisor a $500.00 finder's fee would be paid; in the case of a director sponsoring a person to become a supervisor he would receive a $750.00 fee. In the case where a director sponsored an individual to move from supervisor to a director position the director would receive a $2,500.00 fee. Under this latter circumstance, however, the supervisor could not move up to the director position and the director would not receive his $2,500.00 fee for sponsoring such individual unless the supervisor found someone to replace himself.
Thus, it can be seen how movement occurs at the various levels and how this chain process initiates and continues on ad infinitum. This process, particularly recruitment and replacement, is perhaps most clearly illustrated in Koscot's "Directors Training Manual" which was admitted into evidence before the trial court:
"`This is the strength of our marketing plan. Before any Supervisor can reach the highest position in the field, he must fill his shoes with another Supervisor. This means the number of Supervisors you sponsor into the program can never decrease, but the number of Directors you have will be continually increasing.'"
In the case sub judice plaintiff was formerly a supervisor in Koscot having ascended to a directorship position prior to the time of the transaction in question. As a director plaintiff had "sponsored" defendant as a supervisor for which transaction defendant paid Koscot $2,000.00, with plaintiff receiving a $750.00 finder's fee. Subsequently plaintiff, as a director, sponsored defendant to be elevated from his supervisorship position to director position. It was this latter transaction that gave rise to the $2,500.00 loan, execution of the promissory note and this litigation. Defendant testified, inter alia, that he agreed to become a director and to pay Koscot $2,500.00 if plaintiff would loan him that amount. *838 Accordingly, defendant secured a cashier's check payable to Koscot and both plaintiff and defendant took this check to Koscot's office; whereupon Koscot immediately issued a cashier's check to plaintiff as his "finder's fee" which check, in turn, plaintiff gave to defendant as the substance of the loan transaction. As heretofore mentioned, it was necessary for defendant as supervisor to find a replacement for himself. The record reflects that such a replacement was found so as to perpetuate the chain member-recruiting and pyramid franchising process. It is interesting to note that the monies which form the substance of the loan traveled a full circle going from defendant to Koscot, from Koscot to plaintiff and from plaintiff back to defendant.
Although there is some reference to the sale and transfer of cosmetic products which supposedly is the business in which Koscot is engaged, the evidence indelibly indicates a pyramid franchising scheme possessing all of the requisite features and characteristics so as to bring it within the proscription of F.S. Section 849.091, F.S.A. A sampling of the testimony of the parties and random references to the Directors Training Manual illustrates the true nature of this invidious operation. Quoting from page 21 of the Directors Training Manual, which embodies the "sales pitch" to recruit participants:
"As a Director, you sponsor I Supervisor in the program. Now help your Supervisor become a success. See that he is thoroughly trained make certain he understands the program, and help him sponsor other distributors.
"...
"As soon as he is ready, he will sponsor another Supervisor to replace him, and he will become a Director.
"Now you have I Director and still 1 Supervisor, don't you? Work with your new Supervisor and see that he understands the program and becomes a success. Once he is properly trained, he will replace himself and he will become a Director. Now you have two Directors and 1 Supervisor to work with.
"Continue to help the Supervisor you always have, and make him a success. If it takes you an entire month to advance each Supervisor to Director, you will earn over $33,000 a year! But again, get serious about this! Work with your Supervisor full-time! Advance one Supervisor to Director each week in your organization and you will earn over $143,000 a year! And as a Director you sponsored only 1 man.
"...
"Now let us show you the greatest financial opportunity that KOScot has to offer  the 2% dividend that Directors earn from the Directors they have sponsored!
"As a Director, suppose you sponsor only 5 Supervisors into the program, and then you work with these to make them successful.
"...
"If it takes you a full month to advance each Supervisor to a Director, then at the end of 1 month, you will have 5 Directors and 5 replacement Supervisors.
"At this rate you will gain 5 new Directors per month, or 60 per year. In 2 years, then, you will have 120 trained Directors with women managers running their retail organizations.
"Suppose the average monthly volume of each of your Directors is only $5,000. You are receiving a 2% dividend, and 2% of $5,000 is $100 a month for each Director. $100 times 120 Directors is $12,000 a month or $144,000 a year in dividends you can be earning in 2 years' time!" (Certain diagrams and reference numbers omitted.)
The Training Manual dwells at great lengths on various techniques for recruiting *839 prospects. One such "Helpful Hint" to be followed by a recruiter is:
"DON'T GO INTO DETAILS. Never explain the program to a prospect before bringing him to an Opportunity Meeting. Do not mention Kosmetics or give any particulars, as many people will prejudge the program and decide it is not for them before they see the presentation." (Emphasis ours.)
Under a section of the Manual entitled "Persuasion Techniques" for recruitment the following reference to the signing up of a prospect is further illustrative of the shadowy aspects of this operation:
"Contract! This is another stop sign in our language. Everyone is afraid of a contract. That is why we have none in KOScot. We use application forms and agreement pads.
"No one wants to sign anything either. Ask a prospect to sign a contract and you have just asked him to read all the small print that you can't always explain well enough to him. It is much better to have him okay the agreement."
The following testimony of plaintiff on direct examination by defendant's counsel is indeed illuminating:
"Q Okay. Now, was it necessary to go from a supervisor to a director that the supervisor going to director replace himself as a supervisor or recruit another supervisor?
"A Yes. I would say yes.
"Q And is this  there is Helen B. Thompson here. Is this the supervisor who replaced Mr. Frye?
"A She was, yes, supervisor. And I used her to replace and bring Mr. Frye up as director.
"Q So you recruited her rather than Mr. Frye?
"A No. Mr. Frye was the man.
"Q Are you saying that you did not get Mrs. Thompson to replace Mr. Frye?
"A Oh, yes, I did that.
"Q You found Mrs. Thompson. Is that correct?
"A I did, that is right. She was a supervisor and I used her to bring Mr. Frye in as a Director.
"Q This was a requirement of Koscot, wasn't it?
"A That's right.
"...
"Q Were you in the wholesale or retail end of the Koscot business, Mr. Taylor?
"A I went in the retail end of it as a supervisor, and I wasn't interested in retail; and I went to director and wholesale of it.
"Q Okay. Now, does the word wholesale have any particular meaning in the parlance of Koscot lingo?
"A I don't know what you mean.
"Q Well, what do you mean by the term wholesale?
"A Go out and recruit people and bring them in the program."
One witness who was not a party testified:
"Q When you were a director of Koscot what was your primary endeavor, what did you do for Koscot as a director?
"A I did everything that I could to recruit people to bring in as directors." (Emphasis ours.)
Schemes similar in purpose and operation have received judicial scrutiny and were held to be violative of the law. M. Lippincott Mortgage Investment Co. v. Childress, supra; Florida Discount Centers, Inc. v. *840 Antinori, Fla.App. 1969, 226 So.2d 693, aff'd Fla. 1970, 232 So.2d 17. See also Bond v. Koscot Interplanetary, Inc., Fla.App. 1971, 246 So.2d 631.
In Bond v. Koscot, supra, this court had occasion to review the Koscot operation in the context of whether the allegations in plaintiff's complaint against Koscot were sufficient to establish a cause of action. We observed in part:
"... If the plaintiffs are able to prove that the method and alleged scheme as described in their complaint constitutes a pyramid or lottery as prohibited by Section 849.091, the contract embodying such scheme or plan would be unenforceable and void...."
In our opinion the record in the case sub judice is more than sufficient to prove that the transaction giving rise to the promissory note in question constitutes a lottery as prohibited by F.S. Section 849.091, F.S.A. Since the note in question was given in consideration of participation in an illegal transaction the obligation evidenced thereby is a nullity and is of no legal effect. M. Lippincott Mortgage Investment Co. v. Childress, supra.
It would be contrary to reason and public policy to enforce such contracts. The rationale for not enforcing these agreements and for leaving the parties where the court finds them is based upon the broad ground that "no court will allow itself to be used where its judgment will consummate an act forbidden by law and upon the policy of discouraging illegal and corrupt agreements by refusing all judicial aid to the parties thereto". 17 Am.Jur.2d, Contracts, § 216.
The legislature has made its intent abundantly clear in the enactment of Section 849.091 by prohibiting chain letter transactions and pyramid clubs and subjecting participants upon conviction to criminal sanctions. The courts of this state should be loathe to lend their support to or give approval to any obligation which has an unlawful transaction as its genesis. The enforcement of any written instrument arising out of such proscribed transactions would serve only to encourage further shadowy ventures and would be repugnant to sound morality and civic honesty. A recognition, however, of the illegality of the transaction will hopefully deter others from entering into like illegal contracts.
With respect to the defendant's counterclaim seeking to recover from the plaintiff $2,000.00 which defendant paid for a supervisorship it is our opinion that that transaction, as evidenced by the "Distributor Application and Agreement", falls within the broad definition of "security" as set forth in F.S. Section 517.02(1), F.S.A. A more detailed discussion of the basis for this determination is set forth in Florida Discount Centers, Inc. v. Antinori, supra, and in State ex rel. Healy v. Consumer Business System, Inc., Ore.App. 1971, 482 P.2d 549. Contra Koscot Interplanetary, Inc. v. King, Tex.Civ.App. 1970, 452 S.W.2d 531. Suffice it for us to say that the "agreement" or contract reflecting plaintiff's sale and defendant's purchase of a supervisorship position in Koscot constitutes an "interest in or under a profit-sharing or participation agreement or scheme" within the meaning of Section 517.02(1), F.S.A. Since the sale of the security in question was not shown to be in compliance with the provisions of Chapter 517, under the provisions of F.S. Section 517.21(1), F.S.A., such sale is declared "voidable at the election of the purchaser".
The record in the case sub judice reflects that the defendant complied with the prerequisites for seeking the remedies under Section 517.21. It is not necessary that the person having made the sale be shown to be a "director, officer or agent" of the seller to render him liable to the purchaser for the full amount paid by the purchaser. This section declares that every sale in violation of the chapter is voidable and "the person making such sale" shall be "jointly and *841 severally liable to the purchaser". The evidence clearly shows that the sale of the supervisorship was effectuated by the plaintiff and that the plaintiff received a fee for such sale.
Section 517.21 reflects a broad legislative policy against unlawful security sales by making all persons involved in such sales civilly responsible regardless of whether such person is actually acting for the seller or is himself making the sale. The legislative intent embodied within the provisions of Chapter 517 and F.S. Section 849.091, F.S.A., can and should be given meaning and purpose by a judicial finding that the type of financial activity involved in the case sub judice is within the proscription of such laws.
It is our opinion, therefore, that the trial court failed to give proper legal effect to the evidence before it. Accordingly, the final judgment is reversed with directions to enter judgment in favor of the defendant on plaintiff's claim and on defendant's counterclaim.
CROSS and OWEN, JJ., concur.
NOTES
[1] It should be noted that the plaintiff-appellee has not favored us with a brief and consequently we do not have the benefit of his intentions in this matter. As the Supreme Court of Florida observed in Griffith v. Shamrock Village, Fla. 1957, 94 So.2d 854, 858: "... Briefs of the parties are of great assistance to this Court. If such were not true there would be no cause for allowing them to be filed. Failure to file a brief frequently reacts to the detriment of a party."