**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**GLENN W. TURNER ENTERPRISES, INC., a Florida corporation, et al., Defendants.**

Civ. No. 72–390.

United States District Court, D. Oregon.

Aug. 30, 1972.

James E. Newton, Jack H. Bookey, Francis N. Mithoug, Jerry King, Securities and Exchange Commn., Seattle, Wash., Richard E. Nathan, Asst. Gen. Counsel, Securities and Exchange Commn., Washington, D. C., Sidney I. Lezak, U. S. Atty., Jack G. Collins, First Asst. U. S. Atty., Portland, Or., for plaintiff.

Charles R. Mowry, Dardano, Mowry & Hanson, Portland, Or., for defendants Glenn W. Turner Enterprises, Inc., Dare to be Great, Inc., Donald Ray (Pete) Monroe, Gene Earl Arthur, William C. Sant, Harry Bryant Atkinson, Jack E. O'Brien, Alfred W. (Al) Smith, Le Roy Beale, and Harry D. Everard.

Jeffrey Allen Tew, Tew, Tew, Rozen & Murray, Miami, Fla., for defendants Glenn W. Turner Enterprises, Inc., Donald Ray (Pete) Monroe, Gene Earl Arthur and William C. Sant.

Clarke C. Brown, Salem, Or., and Theodore I. Koskoff, Bridgeport, Conn., for defendant Glenn Wesley Turner.

Bruce E. Jarman, Salem, Or., John A. Burgess, Montpelier, Vt., for defendant Hobart Wilder.

## OPINION WITH FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

SKOPIL, District Judge:

On May 17, 1972, the Securities and Exchange Commission filed the complaint against defendants, seeking an injunction against violation of the federal securities laws, and other relief. The SEC contended that what defendants were selling were securities within the meaning of the statutes. The defendants denied that they were securities and, consequently, moved to dismiss on the grounds that the Court had no jurisdiction over this action. Various memoranda were filed, numerous affidavits and exhibits were presented, and the Court held hearings on the application for a preliminary injunction, appointment of a receiver and an accounting on July 11, 12, 13 and 14, 1972. After the hearings were concluded, the Court heard oral argument on August 14, 1972. Before that hearing, the Court had indicated to the parties that all reserved rulings on the admissibility of evidence would be decided in favor of admissibility and the parties were instructed to argue with that understanding. Both sides rested with respect to the request for a preliminary injunction at the conclusion of oral argument. Accordingly, this matter is now ripe for decision.

## I
## FINDINGS OF FACT

### A. THE DEFENDANTS.

1) Glenn W. Turner Enterprises, Inc. is a Florida corporation.

2) Dare to be Great, Inc., also a Florida corporation, is a wholly-owned subsidiary of Glenn W. Turner Enterprises, Inc.

3) The individual defendants, Turner, Wilder, Atkinson, O'Brien, Smith, Monroe, Everard, and Arthur are, or were, officers, directors or employees of the defendant corporations.

4) The defendant Sant has not been linked to these proceedings.

### B. THE ADVENTURES.

5) Dare to be Great, Inc. offers to sell to the public a series of contracts which it calls "Adventures" and classifies as motivational or self-improvement courses.

The purchaser of Adventure 1 receives a portable tape recorder, 12 lessons contained in 12 tape recordings, and certain written material in notebooks. He is entitled to attend a 12 to 16-hour group session. The cost of Adventure 1 is $300.

Adventure 2 contains, in addition to the materials offered in Adventure 1, twelve additional lessons with tape recordings. It offers approximately 80 additional hours of group sessions. Adventure 2, which necessarily includes Adventure 1, costs $700. In other words, a purchaser of Adventure 1 must pay an additional $400 for Adventure 2. Adventure 2 is not sold without Adventure 1.

The purchaser of Adventure 3 receives, in addition to the material from Adventures 1 and 2, six additional tape recordings, one notebook of written material called "The Fun of Selling," and a limited amount of written instructions and material. The purchaser of Adventure 3 is also entitled to 30 additional hours of group sessions. This Adventure costs $2,000, or $1,300 in addition to the cost of Adventures 1 and 2, which are necessarily included in Adventure 3. The purchaser of Adventure 3, however, receives an additional benefit different in kind from those available in Adventures 1 and 2. After fulfilling relatively nominal requirements, he becomes an "Independent Sales Trainee" and is empowered to "sell" the Adventures. He receives $100 for each Adventure 1, $300 for each Adventure 2, and $900 for each Adventure 3 which he "sells."

The purchaser of Adventure 4 receives six additional tapes, may or may not receive a movie projector with six cartridge-type films, and has the opportunity for 30 additional hours of group sessions. He is also entitled to attend two other week-long courses at his own expense in Florida. For this he pays an additional $3,000, or a total of $5,000 for Adventure 4, which includes the preceding Adventures. He also becomes designated as an "Independent Sales Agent," entitled to "sell" all of the Adventures to others. He receives the same return as does the purchaser of Adventure 3. However, in addition, he is entitled to "sell" Adventure 4, for each of which he receives $2,500, or half the purchase price.

Defendants offer a variation on the Adventures which was referred to in testimony as the "$1,000 Plan." The purchaser of this plan receives the tape cassettes sold in Adventure 2 but without the written material which accompanies them. In addition, a purchaser of this plan receives some additional sales instruction and may be entitled to a 24-hour group session. Unlike a purchaser of Adventure 2, however, he has an opportunity to make money from this plan if he brings two additional individuals to the one who sold him his plan. If those additional individuals purchase the plan, he then becomes entitled thereafter to receive $400 out of each $1,000 paid for the purchase of the plan by any further additional purchasers of the plan who purchase through him. Each additional purchaser, of course, must in turn

bring him yet three more in order for that additional investor to become entitled to income from this plan.

It is possible to enter this plan without making an investment by bringing in one extra person, i. e., three rather than two.

## C. THE SYSTEM IN OPERATION.

6) Salesmen of these Adventures seek new customers anywhere. They accost strangers in stores, streets and elsewhere and make no attempt to search out persons with sales ability, financial acumen or other skills. Those who eventually do make purchases appear to have fairly limited resources and education.

7) Salesmen must not explain to prospects anything about what they are selling. Their duty is strictly limited to arousing curiosity in the prospect and persuading him to attend an "Adventure Meeting," organized by defendants. One of the principal methods of arousing curiosity which is demanded by defendants is that the salesmen make a display of great wealth. A salesman should drive an expensive car, wear expensive clothing and display large amounts of currency in high denominations, while intimating that the prospect also can have an opportunity for great wealth. Despite the display, the salesman may, in fact, be nearly destitute.

8) The principal selling effort occurs at meetings and other functions organized by defendants. The salesman has no control over these meetings. The atmosphere is one of potential overwhelming financial return, dramatized by the appearance of large numbers of expensive cars, expensively-dressed individuals, and stories of great riches achieved through defendants' operations.

9) Meetings are conducted with an appearance of great spontaneity. Speakers talk loudly and rapidly with great emotional fervor. There are cheers and chants from the audience. The speakers, however, follow a strict script written by defendants' central organization, and they are not permitted to depart from it. The cheers and chants are prearranged. The speakers make somewhat passing reference to the motivational courses and what they will do for individuals. The major emphasis, however, is on the opportunities for earning money by purchasing Adventure 4. The script followed by defendants' speakers carefully avoids actually guaranteeing a return and does contain a statement that the prospect must expect to work. The impression which is fostered, however, by emphasis and psychological technique, is on the near inevitability of success achieved by anyone who follows defendants' directions. For example, it is said that one individual earns $50,000 per month, which is described as an unusual achievement, although the salesman was an ordinary person. A housewife's earnings of $16,000 per month are called "good." Some people earn nothing, which is described as "very poor," and is attributed to their failure to "believe in the philosophy of millionaires."

10) At no time do defendants' agents make any effort to explain potential difficulties of saturation and pyramiding. It is not revealed that those who make the pitch are far from earning the amounts which they say are ordinary results.

11) After the speakers have finished, salesmen attempt to persuade the prospect to buy one of the Adventures, with emphasis on Adventure 4. Sometimes the individual salesman makes this offer, but at other times, agents of defendants who are specialists at the required techniques of psychological hardsell take over and accomplish the sale. On occasion the sale has been accomplished in the name of the individual who gets credit for it, without the latter even having been present. Sales tactics which are employed are calculated to ignore and bypass rational objections and analysis. The emphasis is, again, on large amounts of easy money. The technique is so strictly prearranged that it contains, for example, instructions how to write $130,000 and other sums on the paper, and to avoid asking the prospect

to sign a contract because that sometimes triggers the response of wanting to read it. On at least some occasions, potential customers who object that they do not have the money required are told how they may get bank loans by deceiving the banks as to the purpose of the loan, and by making simultaneous applications at a number of different banks without informing any of them that the other applications have been made.

12) The prospects are also encouraged with great emphasis on the possibility that by "getting in on the ground floor," they will have opportunities for future lucrative investments and employment in defendants' forthcoming ventures.

13) Prospects who have not succumbed at the Adventure Meetings may be taken on a "go-tour" to one of defendants' regional centers by airplane or bus. They are brought to an environment where they are isolated from other contact and are surrounded by defendants' agents and employees. The same psychological techniques and the same kinds of representations as they use at the meetings are employed on these tours.

14) Few, if any, purchasers of these Adventures have achieved any success remotely approaching that described by defendants' agents, to their financial and emotional distress.

15) Saturation of the market has, in fact, occurred at least in some localities. Purchasers have found themselves unable to resell the Adventures to others because those whom they approach either have already purchased or else have been made wary by having been approached by other salesmen.

II

CONCLUSIONS OF LAW

A.

It is apparent from this Court's findings of fact that the defendants are promoting a type of scheme commonly known as a pyramid operation. Pyramid schemes are inherently unstable and eventually must collapse. As the SEC has pointed out, there is inevitably a limit to the number of investors who can get their money back. Investors get a return only so long as increasing numbers of others like them invest their own money. Consequently, it is certain that the source of funds must eventually dry up leaving a large proportion of the investors stranded with their losses. In this respect, the scheme is closely analagous to so-called chain letters which are unmailable under the provisions of the Mail Fraud Statute, 18 U.S.C. § 1341. The question for this Court is whether what defendants offer their investors is a security within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934.

B.

The Supreme Court has insisted that the Securities Acts must be interpreted liberally and broadly. It has rejected narrow and strict construction in order to carry out the remedial purposes of the legislation. Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In the same opinion the court approved a certain interpretation of the Securities Act of 1933 because it embodied

. . . a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits. 328 U.S. at 299, 66 S.Ct. at 1103.

The very purpose of the statutes would be violated if they were construed to apply only to familiar and conventional transactions and were not capable of adaptation to novel and irregular schemes fairly covered by the intent and text of the statutes. Thus, the Supreme Court has said that in interpreting these acts, "form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Years before, the Supreme Court had stated that the test

of the applicability of these acts was "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." Securities and Exchange Commission v. C. M. Joiner Leasing Corp., 320 U.S. 344, 352–353, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943).

It is apparent that defendants' pyramid promotion contains the same evils which the Securities Acts are intended to suppress. Defendants have devised a novel scheme to seek the use of money of others on the promise of profit to them. Defendants stated to the Court, and the Court agrees, that compliance by defendants with the provisions of the Securities Acts would mean the death of this enterprise. In the opinion of the Court, this is so because the disclosure and anti-deception provisions of the statutes would be totally inimical to the success of the promotion, for it is based upon blinding potential prospects to the realities of the scheme.

■ Defendants argue that what they offer their prospects are not securities nor investments but in reality products and services. It is true that in each of the various "Adventures" there are tape recordings, printed materials and various devices which are made available to the adventurers. Without passing judgment on the quality or value of these materials, it is nevertheless obvious that defendants are involved in much more than the mere sale of a product. There are distinct promises made to potential customers and, consequently, it is the duty of the Court to consider them separately. Securities and Exchange Commission v. United Benefit Life Ins. Co., 387 U.S. 202, 207–209, 87 S.Ct. 1557, 1559–1561, 18 L.Ed.2d 673 (1967). The evidence presented by the SEC indicates that defendants have promoted their scheme as an investment and have so represented it to the objects of their sales efforts. In this context the Supreme Court's remark in *Joiner* is apropos:

■t is not inappropriate that promoters' offerings be judged as being what they were represented to be. 320 U.S. at 353, 64 S.Ct. at 124.

It is equally clear from the evidence that the purchasers of the higher-priced Adventures thought they were paying for something more than the materials. That something was the promise and expectation of a return on their investment. It is primarily for these reasons that under the laws of three different states the offerings of defendants have been construed to be investments in securities, and consequently, in violation of state laws governing the sale and promotion of such schemes.

■ There is little doubt, then, that defendants are soliciting investments on a grand scale from individuals of relatively limited resources and education. As defendants tirelessly emphasized, it is nevertheless true that in order to subject them to the provisions of the securities acts, it must be determined that they are offering and selling securities as that term is used in the statutes.

■■ Throughout these proceedings, defendants have taken the unjustified position that the opportunities offered in their contracts to potential customers are securities only if they are "investment contracts." Statutory definitions, however, are considerably more inclusive. In the Securities Act of 1933, 15 U.S.C. § 77b(1),

> The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certif-

icate for, receipt for, guarantee of, or warrant- or right to subscribe to or purchase, any of the foregoing.

In the Securities Exchange Act of 1934, 15 U.S.C. § 78c(10),

> The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subcription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

It is obvious that whether or not this promotion offers investment contracts, it offers securities for sale so long as any one or more of the terms used in the statutes are satisfied.

### C.

■ The SEC suggested that defendants' offering satisfied the general categories of the statutes, i. e., "in general, any interest or instrument commonly known as a 'security'." As far as can be determined, these general phrases have not been applied by any court, and there are no precedents directly in point for the guidance of this Court. However, as a principle of statutory construction, these general categories cannot be disregarded or construed as devoid of meaning. Considering the nature of these statutes, the inclusion of these general phrases is yet another indication of the strength of the congressional desire that the statute be interpreted broadly, flexibly and liberally. Congress wanted to provide no loopholes for promotions in conflict with the purposes of the securities laws.

■ The Court doubts that Congress intended that in order to qualify under these general categories, a transaction must be commonly known to the man in the street as a security. Most securities are rather technical in nature and not likely to be understood except by the legal or financial community. It is sufficient that an offering be considered as a legal matter to be a security, regardless of the popular perception of it. Since the Supreme Court has indicated that it is appropriate to look to state law to give content to the terms used in the definition, *Howey* supra, state decisions may be a most trustworthy authority on what is commonly known as a security.

State courts have made admirable efforts to interpret the securities laws consistent with their purposes. Over ten years ago, the California Supreme Court articulated a test which simply recognized that the subjection of the investor's money to the risk of an enterprise over which he exercises no managerial control is the basic economic reality of a security transaction. Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961). The California test, called the "risk capital" test, has since been substantially adopted by courts in a number of states; State of Hawaii by Commissioner of Securities v. Hawaii Market Center, Inc., 485 P.2d 105 (1971); Hurst v. Dare to be Great, Inc., Civ. No. 71-160, (D. Or., January 12, 1972); State ex rel. Healy v. Consumer Business System, Inc., 92 Or. Adv. Sh. 287, 482 P.2d 549 (Ct. of Appeals, 1971); Venture Investment Co., Inc. v. Schaefer, Civ. No. C-2732 (D. Colo., June 16, 1972); Mr. Steak, Inc. v. River City Steak, Inc., 324 F.Supp. 640 (D. Colo. 1970), aff'd., 460 F.2d 666 (10th Cir. 1972); State of Idaho v. Glenn Turner Enterprises, Inc., Civ. No. 47773 (Dist.

Ct., 4th Jud. Dist., March 28, 1972). By applying the risk capital test, defendants' promotions have been held to be securities under the laws of Oregon and Idaho; Hurst, State of Idaho, supra. They have also been held to be securities as well as a lottery under the laws of the state of Florida, Frye v. Taylor, 263 So. 2d 835 (Fla.Dist.Ct. of Appeal, 4th Dist., 1972). Although not entirely clear, it appears that the Florida court adopted the risk capital approach because it cited *Healy* as the basis for its determination.

■ The spread of the risk capital theory from the state in which it was first applied to other states and the favorable comment with which it has been received make it an appropriate test to look to for determining what is "commonly known as a security." There probably have been few schemes devised that more closely meet the test than does the *defendants' promotion*. In the opinion of the Court, both the letter and the purposes of the statutes are satisfied by holding, therefore, that defendants are offering and selling contracts which are *commonly known as securities* within the meaning of the federal statutes.

### D.

The issue which was most thoroughly litigated was whether these contracts are "investment contracts" within the meaning of the statutes. The Supreme Court first defined the term "investment contract" in *Howey,* wherein it said:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. . . . 328 U.S. at 298–299, 66 S.Ct. at 1103.

What defendants offer their prospects easily meets the first two criteria of this three-part test. As noted previously, the contracts were regarded as investments both by sellers and purchasers. Similarly, this promotion embodied a common enterprise, for any return to the investors depended upon the defendants' success in inducing yet more people to invest their money.

The real sticking point in the definition of an investment contract is the requirement that investors expect profit *solely* from the efforts of others. Defendants stress that investors are told they must do sales work in order to get any return at all. The "work" required of investors is to persuade additional individuals to come to meetings organized by defendants where they may be subjected to the full force of defendants' hard sell. Furthermore, they are encouraged to make ostentatious displays of wealth to deceive prospective customers. Defendants, therefore, conclude that the profits in this enterprise do not come solely from defendants' own efforts but rather are dependent in whole or in part upon the efforts of the investors themselves. It follows, they argue, that these transactions are not investment contracts within the Supreme Court's definition and that, consequently, they are not securities within the meaning of the statutes.

It is by no means clear that the Supreme Court intended its three-pronged definition of an investment contract to be a litmus test which must be applied literally and strictly. A narrow focus on this particular locution seems anomalous for the court has already said, in interpreting the statutes themselves, that liberal and broad interpretations are required in order to carry out the intent of Congress. From this flows the court's stress on the economic realities behind transactions, on substance rather than form. Furthermore, in this particular area of the law, to insist upon a strict application of a definition would inevitably lead to the exploitation of loopholes created by that definition. For example, if the "solely from the efforts of others" test were to be applied

strictly as defendants urge, any number of devices can be invented to avoid that test. Promoters could require some nominal effort of their would-be investors along with the contribution of their money, such as solving a puzzle or writing an essay. This Court has doubts that either the Supreme Court or the Courts of Appeals would sanction such efforts to evade the securities laws.

In cases which have construed the "solely from the efforts of others" test, the emphasis has been on the economic realities in each case. Although the Court of Appeals underscored the test in Chapman v. Rudd Paint and Varnish Co., 409 F.2d 635 (9th Cir. 1969), the franchise agreement in that case which was unsuccessfully alleged to be a security contemplated a major and controlling role for the plaintiff-franchisee. The extensive efforts of the franschisor were devoted mainly to equipping and stocking that franchise after which point it was turned over to the franchisee and became dependent upon his efforts. In another case in which the franchise agreement was alleged to be a security, the emphasis on the role played by the franchisee was even more apparent. *Mr. Steak*, supra. The court there found it necessary to weigh the relative participation in the control of the franchised restaurant before determining that the substantial degree of authority held by the franchisee was inconsistent with a securities transaction. See also Romney v. Richard Prows, Inc., 289 F. Supp. 313 (D. Utah 1968), in which the plaintiff was unsuccessful in attempting to have the transaction declared an investment contract because he had an important role in the success or failure of the enterprise.

The most essential consistency in the cases which have considered the meaning of "investment contract" is the emphasis on whether or not the investor has substantial power to affect the success of the enterprise. When his success requires professional or managerial skill on his part, and he has authority corresponding with his responsibility, his investment is not a security within the meaning of the securities acts. When he is relatively uninformed and unskilled and then turns over his money to others, essentially depending upon their representations and their honesty and skill in managing it, the transaction is an investment contract.

In applying the Supreme Court's definition of an investment contract, therefore, the efforts of others which are relevant for purposes of the definition are those essential managerial efforts which affect the failure or success of the enterprise. In this context, there are several significant aspects to defendants' promotion. First, they seek to entice anyone who can pay the cost of the "Adventures," without regard to their education, sales and managerial skills. In fact, defendants are apparently most successful with individuals of limited ability and resources who have no particularly appropriate skills. It is irrelevant that some of the investors may have been adroit at this kind of sales tactics because defendants have offered the promotion to all, and the securities acts prohibit the offer as well as the sale of unregistered, nonexempt securities. Securities and Exchange Commission v. Howey Co., 328 U.S. at 300–301, 66 S.Ct. 1100. Second, the "efforts" of these investors are in practice limited to approaching other people and soliciting them to come to meetings organized by defendants. Their role is so limited that they are not even permitted to tell their quarry the nature or purpose of the meeting. The significant efforts in this promotion are the specialized, professional, high-powered tactics used at these meetings by defendants, and the ordinary investors by themselves would be unsuccessful at persuading anyone else of parting with $2,000 to $5,000. The SEC aptly paraphrased the Supreme Court opinion in *Joiner* by characterizing defendants' revival-type sales methods as the common thread upon which everybody's beads were strung. Third,

the success of any investor depends on a factor of which he is not made aware, i. e., saturation of the market as the pyramid expands. Saturation is important at every stage, but eventually it, along with general awareness of it, must become the only important factor, at which time efforts of the investor are simply irrelevant, even if he spends all his time in futile efforts to sell the unsellable. Since what defendants offer and sell is the right to sell the right to sell *ad infinitum*, this ultimate irrelevance of investors' efforts is inherent in any offer to sell. In contrast to an investor's ineffectual efforts, the degree of saturation is defendants' responsibility. Accordingly, the Court concludes that the efforts which are significant to the success or failure of this enterprise are those of defendants and that, consequently, their promotion constitutes an offer of an investment contract within the meaning of the Securities Act and the Securities Exchange Act.

This Court's conclusions are buttressed by the historical antecedents of the Supreme Court definition of an investment contract. In *Howey* that term was given the meaning that it had under state law at the time of the enactment of the Securities Act. The case which apparently was the principal source of that definition was State v. Gopher Tire and Rubber Co., 146 Minn. 52, 177 N.W. 937 (1920). In that case, decided before the enactment of the federal statutes, the state court held that a scheme analogous to that in question here which required investors to solicit additional customers was an investment contract and, consequently, a security within the meaning of the state laws.

### E.

Initially, the SEC's prinicpal legal theory apparently was that the contracts offered by defendants were certificates of interest or participation in profit-sharing agreements, as that term is used in the statute. Defendants hardly replied to this theory, however, and consequently there was little discussion of it.

█ Although this category of security has been subjected to considerably less judicial interpretation than the term investment contract, it would seem that its plain meaning encompasses these transactions. What the investors receive, after all, is a right to a cut of the profits from other investors. In the opinion of this Court, it is immaterial that the entire profits in Dare to be Great are not divided up among all the investors and that they are only entitled to the profit from a particular designated source. In other words, an agreement to share some profits is within the meaning of the statutes as well as an agreement to share all profits.

It should be recalled that the "solely from the efforts of others" test is part of the definition of investment contract, not of the definition of security. More specifically, the Supreme Court has not said that in order for a transaction to constitute a certificate of interest or participation in a profit-sharing agreement it must contemplate no effort on the part of the investor. Even if the "solely" test should be applied to this type of security as well, the Court concludes for the reasons set forth above that that test is met here and that these contracts also are certificates of interest and participation in profit-sharing agreements as well.

### III

### RELIEF

█ Defendants deny that they are violating any securities laws and insist that they are entitled to continue what they contend are legitimate business activities. They have given no indication that they will voluntarily cease violations of the statutes. Accordingly, the injunctive relief requested by the SEC is appropriate to prevent further violations and to protect the public. Defendants will be enjoined from selling, or of-

fering to sell, the so-called Adventure 3 and Adventure 4 in violation of law. Adventures 1 and 2 do not appear to involve any security inasmuch as the purchasers of them are not given to expect any return from them. The so-called "$1,000 Plan" is no less a pyramid promotion and a security than Adventures 3 and 4, and, consequently, will also be enjoined.

The injunction will be directed against the corporate defendants, Glenn W. Turner Enterprises, Inc. and Dare to be Great, Inc. Of course, the order will include all officers, agents and employees of the corporate defendants, and by the terms of the order they must be informed of it. The role of the individual named defendants is not sufficiently developed in these proceedings to warrant injunctive relief specifically against them now, particularly in light of the evidentiary objections raised on their behalf. However, should the relief granted herein prove to be insufficient, the SEC may, of course, present a motion to broaden the injunction and will be afforded an opportunity to make a proper showing that it is necessary.

■ The Court recognizes that this order may have a drastic effect upon defendants' business. Since the decision rests in part on relatively untried legal theories, the order against selling or offering for sale securities will be stayed for ten days in order to afford time to seek further relief from another forum. However, effective immediately, defendants are prohibited from withdrawing any funds or assets from the corporate defendants other than in the regular and ordinary course of business. Los Angeles Trust Deed & Mortgage Exchange v. Securities and Exchange Commission, 264 F.2d 199, 213 (9th Cir. 1959).

The SEC has not shown that the corporate defendants are insolvent or that the appointment of a receiver is otherwise appropriate.

The request for an accounting will similarly be denied since the SEC has not made a showing that this relief is either proper or necessary.