**MR. STEAK, INC., a Colorado corporation, Plaintiff,**

**v.**

**RIVER CITY STEAK, INC., an Iowa corporation, Defendant.**

**Civ. A. No. C-1787.**

United States District Court, D. Colorado.

Sept. 30, 1970.

Sanford B. Hertz, Robert W. Hite and Robert R. Hoadley, Jr., Denver, Colo., for plaintiff.

Schneider, Shoemaker, Wham & Cooke by Robert S. Wham and Joffre M. Johnson, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

ARRAJ, Chief Judge.

This matter is before the Court on plaintiff's motion to dismiss certain of defendant's counterclaims for failure to state a claim upon which relief can be granted. Alternatively, plaintiff has moved for summary judgment on those counterclaims.

This suit is a consequence of the sale by Mr. Steak to River City Steak of a franchised restaurant operation upon an initial investment of thirty-five thousand dollars and payment of weekly fees derived from the restaurant's gross sales. The franchise agreement was executed April 2, 1968, stipulating location of the restaurant in Mason City, Iowa. By an addendum dated October 3, 1968, the site was ultimately transferred to Sharon, Pennsylvania. There the restaurant was constructed according to plans and specifications furnished by plaintiff on premises leased by it and subleased to defendant at the same rental. As required by the franchise agreement, the defendant executed a "restaurant manager's agreement" with Mr. Zenk, who had been recruited and trained by Mr. Steak.

After a period of losing operations, River City Steak defaulted on rental, insurance and weekly franchise payments, and plaintiff commenced this action to recover those monies. Defendant's counterclaims, numbered four through seven, arise from the same series of transactions and relate to Mr. Steak's failure to register its franchise system as a security under the Securities Act of 1933, 15 U.S.C. § 77a et seq., and the Colorado Licensing and Practice Act, CRS, ch. 125 (1963). Defendant claims relief because of statements made by Mr. Steak concerning the size, character and market potential of Sharon, Pennsylvania, which induced it to relocate the franchise there. River City Steak contends that those statements were fraudulent and misleading within the anti-fraud provisions of section 12(2) and section 17 of the Securities Act of 1933, 15 U.S.C. § 77l (2), § 77q, of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and regulation 10b–5 thereunder, 17 C.F.R. 240.10b–5, and of section 125–1–1 of the Colorado Licensing and Practice Act, CRS, ch. 125 (1963). Mr. Steak's motion questions the propriety of applying the registration provisions and penalties of federal and state securities law to its franchise operations.

For purposes of testing the sufficiency of plaintiff's complaint, a motion to dismiss for failure to state a claim admits all well-pleaded facts and allegations, Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); Ryan v. Scoggin, 245 F.2d 54 (10th Cir. 1957), but not unwarranted inferences or conclusions of law predicated thereupon. Ryan v. Scoggin, supra; Ward v. Hudnell, 366 F.2d 247 (5th Cir. 1966).

Defendant contends that we are not bound by the form, generic name or characterization employed by the parties to describe their agreements. We agree. See S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L. Ed. 88 (1943); United States v. Herr,

338 F.2d 607 (7th Cir. 1964). The Supreme Court noted in *Joiner:*

> In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of the particular document or offering. The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they are represented to be. 320 U.S. at 352–353, 64 S.Ct. at 124.

*See also* S. E. C. v. United Benefit Life Ins. Co., 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967); Continental Marketing Corp. v. S. E. C., 387 F.2d 466 (10th Cir. 1967), both of which emphasize economic reality in determining the nature of a particular offer or sale. We must consider *in toto* the economic effect of various contracts and leases executed by the parties as they reflect facts necessary to delineate the legal character of these transactions.

We note initially that since the leasing agreement merely transfers the right to occupy the premises, consideration of its terms is unnecessary. Turning to the franchise agreement, we find that Mr. Steak is not granted, nor does it assume, the power to direct the daily operations of the restaurant. True, the franchise agreement specifies in great detail the relation between the two parties, and does accord Mr. Steak extensive supervisory powers, but the parties disagree as to the significance of those powers.

The majority of terms contained in the franchise agreement could be found in many other business contracts. For example, Mr. Steak is responsible for constructing and equipping the establishment and training the manager. The franchisee, on the other hand, must carry insurance, maintain trade secrets, submit to periodic inspections, appoint a specified agent to receive process, and cannot compete with Mr. Steak or sell or assign without Mr. Steak's approval. In exchange, and upon the payment of fees specified in the franchise agreement, the franchisee is granted the exclusive right to vend under the Mr. Steak name in a certain territory.

■ Other provisions in the agreement are designed to further tangible interests of Mr. Steak. Requiring the franchisee to use certain uniforms, to buy certain products to the exclusion of all others, to allow Mr. Steak the exclusive right to train its manager, to spend specified sums on prepared or approved advertising, and to allow Mr. Steak to participate in the initial hiring and opening of the restaurant are justified, we think. Since Mr. Steak's national image and reputation depend in large measure upon the quality of food and service at individual restaurants, it has an abiding interest in maintaining uniformly high standards to promote its own continued growth. We think that such provisions are justifiable as an eminently practical way for Mr. Steak to insure its future economic stability, and are not merely convenient tools to circumvent the protective provisions of federal securities law.

Some of the other terms of the agreements cause us more difficulty and our analysis of them is critical to characterization of the agreements before us. Provisions relating to the restaurant manager are an example. The franchise agreement specifies that either the franchisee or Mr. Steak, if the former fails to act, can select the manager. Mr. Zenk was selected by Mr. Steak without consultation with defendant. Following training by Mr. Steak, the manager is charged by the franchise agreement with operating "a sanitary, efficient and high quality Mr. Steak restaurant," as defined by Mr. Steak directives. The agreement also specifies his salary and requires an investment in the franchisee's stock. In the present case, Mr. Zenk was required to invest five thousand dollars and assign his stock to Mr. Steak. Upon termination, the manager is guaranteed a like amount or the ac-

tual value of his stock, whichever is greater. The agreement further provides that the manager "shall be the only person who shall be permitted to actively manage the Mr. Steak restaurant," and states:

> The ASSOCIATE hereby irrevocably grants to MR. STEAK the power to supervise, instruct and direct the actities, duties and functions of the Investor-Manager and in the event the Investor-Manager does not comply with any directive or recommendation by MR. STEAK, then the ASSOCIATE hereby agrees that MR. STEAK can, at its absolute discretion, remove said Investor-Manager from the active operation of the ASSOCIATE'S MR. STEAK restaurant herein and replace him with another individual chosen by MR. STEAK
>
> \* \* \*

The franchisee has no voice in his replacement.

While these provisions would seem to accord Mr. Steak *de facto* control over the entire restaurant operation by exercising control over the manager chosen by it, their impact is somewhat lessened by terms contained in the restaurant manager's agreement, which is referred to in the franchise agreement and which relates to similar duties. That agreement provides:

> The INVESTOR-MANAGER agrees to continually maintain a general reputation in his business community for honesty, integrity, good credit and conduct a Mr. Steak restaurant in an honest and upright manner and to operate the restaurant according *to all standards set up by the ASSOCIATE* and MR. STEAK. (Emphasis added.)

The manager is also responsible for conducting operations according to standards and recommendations of Mr. Steak, and the franchisee can inspect only during reasonable business hours. However, while the manager is given the "sole right to manage and control the daily operation and affairs of the Mr. Steak restaurant," his conduct "is sub-

ject to approval *by the* ASSOCIATE and MR. STEAK, INC." Paragraph eight of the agreement grants the franchisee the right to terminate the manager's employment upon two weeks written notice to him and Mr. Steak. Although these provisions may conflict with the termination clause of the franchise agreement, we think it is evident that the franchisee was intended to retain some power over the conduct of his business. A thorough reading of the documents in question convinces us that Mr. Steak is accorded absolute discretion to terminate the manager *only* for violation of its directives, and that either party may terminate for other reasons. The legal effect of these provisions will be considered *infra*.

The second set of provisions that we find troublesome relates to the franchisee's abdication to Mr. Steak of control over its financial affairs. To secure the franchise, River City Steak was required to give Mr. Steak the power to pay all salaries and accounts payable from its bank accounts. The franchisee was also required to transmit, either personally or through the manager, weekly franchise fees and meat count; all invoices, statements and delivery tickets for items purchased; records of cash received and deposited; duplicate bank deposit slips; duplicate cash register tapes; receipts for items paid for in cash by the franchisee; and a complete food inventory. The franchisee was also required to direct his bank to send all account statements and daily deposit verification slips directly to Mr. Steak. After receipt, Mr. Steak agreed to provide professional management services, and to pay the franchisee's operational expenses, as noted above. In exchange for these services, defendant is obligated to remit a sum keyed to weekly gross sales, which varies between four and seven percent of those sales. Apparently, a portion of this payment includes reimbursement for the use of the "Mr. Steak" tradename.

The practical consequence of these provisions was to afford Mr. Steak an

effective control system over the franchisee's receipts and operations. The cost to the franchisee is loss of control over some phases of his financial operations although his business judgment need not be otherwise impaired.

None of the security acts relied upon by River City Steak specifically mentions franchises. Section 2(1) of the Securities Act of 1933 provides:

The term security means any note * * * certificate of participation in any profit-sharing agreement * * * investment contract * * * or, in general, any interest or instrument commonly known as a "security" * * * 15 U.S.C. § 77b(1).

The Securities Exchange Act of 1934 contains a similar definition in section 3(a) (10), 15 U.S.C. § 78c(a) (10), as does CRS § 125–1–12(12) (1963).

In the leading case of S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court, considering an investment contract, approved the state court practice of reaching diverse schemes by broadly construing the term "investment contract" to afford "the investing public a full measure of protection," and held that the 1933 Act adopted a meaning "which had been crystallized by prior judicial interpretation." 328 U.S. at 298–299, 66 S.Ct. at 1103. Many later courts, considering the reach of the 1933 Act, have concluded that since the purpose of the Act is to protect passive, relatively uniformed investors, and since it is remedial in nature, Berko v. S. E. C., 316 F.2d 137 (2nd Cir. 1963), it should be liberally construed. See Llanos v. United States, 206 F.2d 852 (9th Cir. 1953) cert. denied 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417; United States v. Monjar, 47 F.Supp. 421 (D.Del.1942) aff'd 147 F.2d 916; Newman v. Weinstein, 229 F.Supp. 440 (S.D.Ill.1964).

An investment contract was defined in Howey as

a contract, transaction or scheme whereby a person invests his money in a common enterprise and is

lead to expect profits *solely* from the efforts of the promoter or third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests * * * in the enterprise. 328 U.S. at 298–299, 66 S.Ct. at 1103 (emphasis added).

Defendant urges that, in light of the judicially enunciated policy respecting the 1933 Act, *Howey's* statement that investment contracts arise only where profits flow from the actions of others is no longer viable. Rather, defendant asserts the better position is to treat any contract which contemplates the investment of funds without effective control or participation by the investor as an investment contract. The logic of defendant's position is that it exercised no control over the operations of the restaurant, and that its participation was limited to supplying funds for Mr. Steak's operations. From the facts adduced for consideration of this motion, no issue has been raised questioning the existence of a "common scheme" or the promise of profits.

Affidavits of Bernard Rausch, president of River City Steak, and of John Zenk, manager of that operation, state, in essence, that River City Steak exercised no control over the daily affairs of the restaurant, but that Mr. Steak actually, either directly or through Mr. Zenk, became responsible for the conduct of business. As those statements relate to contractual responsibilities we accept them as true. We do not, however, accept defendant's legal conclusions.

■ As we view the problem presented by this motion, who exercised actual control over the restaurant is not determinative. Rather, it is merely a factor to consider. Recently, the Tenth Circuit had occasion to consider this question. In Continental Marketing Corp. v. S. E. C., 387 F.2d 466 (10th Cir. 1967), the Court stated:

We do not think the element of ownership or control is essential. The better approach and the one which the

Supreme Court in *Howey* noted was being employed by the state courts is to disregard form for substance and place emphasis on economic reality. The more critical factor is the nature of the investor's participation in the enterprise. If it is one of providing capital with the hopes of a favorable return then it begins to take on the appearance of an investment contract notwithstanding the fact that there may be more than one party or other than a principal party and his agent on the other end of the transactions. 387 F.2d at 470.

*See also* S. E. C. v. C. M. Joiner Leasing Corp., *supra.*

■ Both the franchise agreement and the restaurant manager's agreement contemplated that River City Steak would play an active, if severely circumscribed, role in the conduct of the restaurant. It is also evident that neither a manager nor subsidiary personnel could be totally unresponsive to River City Steak, which had the power to terminate their employment. In fact, a reading of both contracts suggests to us that the role of the franchisee was envisioned as a flexible one, depending upon the business expertise and inclination of the franchisee. Most duties mentioned in the franchise agreement could be performed by the franchisee, or delegated to the manager. That River City Steak delegated performance of those duties and ignored daily operations does not affect the nature of its powers, nor change the essential fact that River City Steak abandoned what rights of control and participation it did have.

Considering the extent of River City Steak's financial participation in the restaurant, we find a situation fundamentally different from that present in both *Howey* and *Continental Marketing.* In the latter case, the investors were unfamiliar with raising beavers, and the cost of purchasing and housing them individually was prohibitive compared to the cost of contracting for their care. They were encouraged not to take possession of the beavers, and none in fact

did. In *Howey* the Supreme Court noted that:

The purchasers are for the most part non-residents of Florida. They are predominantly business and professional people who lack the knowledge, skill and equipment necessary * * * They are attracted by the expectation of substantial profits. 328 U.S. at 296, 66 S.Ct. at 1102.

Here, in contrast, it does not appear that River City Steak was an uninformed investor. It was acquainted with the nature of the business it undertook. Even though a "turn-key" operation was sold, it remained the sale of a business which the defendant could control and included the normal risks incident to operation of any enterprise. *See* Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635 (9th Cir. 1969), where a similar "turn-key" distributorship was held not to involve the sale of securities. River City Steak's financial participation was unlimited, and it remained liable for continuing operational expenses.

Additionally, defendant has not endeavored to show that it was prevented from directing the operations of the restaurant or that it lacked the requisite knowledge, skill or expertise to undertake that task. Defendant here bought the "chance to make a great deal of money," but only if it could successfully operate the restaurant. Roe v. United States, 287 F.2d 435, 439 (5th Cir. 1961); Continental Marketing Corp. v. S. E. C., *supra,* citing *Roe.* We contrast the usual investor-promoter situation, where the skill or ingenuity of the investor does not determine the success or failure of the venture and where the investor's fortunes parallel those of the promoter, to the present situation, where River City Steak's enterprise stands or falls independently of Mr. Steak's success or failure. *See, e. g.,* S. E. C. v. W. J. Howey Co., *supra;* Continental Marketing Corp. v. S. E. C., *supra;* Farrell v. United States, 321 F.2d 409 (9th Cir. 1963); Roe v. United States, *supra;* Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953); Penfield Co.

of California v. S. E. C., 143 F.2d 746 (9th Cir. 1944); S. E. C. v. Universal Service Ass'n, 106 F.2d 232 (7th Cir. 1939); S. E. C. v. MacElvain, 299 F. Supp. 1352 (M.D.Ala.1969). To characterize the contracts which create this relationship as a security would work an unwarranted extension of the Securities Act of 1933.

It is evident from the foregoing analysis that Mr. Steak's offer and sale of franchised outlets cannot be characterized as a security under the *Howey* test. *See also* Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635 (9th Cir. 1969). We may, however, view defendant's contentions in another light. One salient feature of most cases finding an investment contract has involved the solicitation of funds for speculative, poorly-financed business ventures, *e. g.,* S. E. C. v. C. M. Joiner Leasing Corp., *supra*; Roe v. United States, *supra*; S. E. C. v. Bailey, 41 F.Supp. 647 (S.D.Fla.1941); S. E. C. v. Universal Service Ass'n, *supra*; or emergent industries. *E. g.,* Continental Marketing Corp. v. S. E. C., *supra*; S. E. C. v. Payne, 35 F.Supp. 873 (S.D.N.Y.1940). In these instances, the investor, even if he can participate in or control some phase of the enterprise, is gambling "risk capital", where there is less than an even chance of success, against the opportunity for large profits. Because of the substantial risk of loss, to include such operations within the purview of the 1933 Act would fulfill the purpose of protecting passive investors by compelling disclosure of the disquieting aspects of a scheme. Under this approach, once the requisite risk is shown there would be no compelling reason to exclude a franchise operation from the Act's coverage.

Since no federal court has yet considered the risk capital approach, we must look to state law for its basic tenets. The *Howey* case noted that prior state judicial determinations had "crystallized" the meaning of the definitions employed by federal security law and looked to state "Blue Sky" laws to interpret the federal Act. We consider the California experience under a security law similar to the federal Act as particularly instructive in this regard.

The seminal case in California security law, which signals a departure from prior definitions of securities, is Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961). In that case, the purchase and improvement of facilities for a country club were financed by the sale of memberships in the club. Members had no right to the income or assets of the club, but could use facilities and could not be expelled except for nonpayment of dues or misbehavior. Membership could only be transferred by permission of the board of directors. The court agreed with the California attorney general that a security interest had been created.

The court noted that Silver Hills had solicited risk capital to develop the club, a situation which was considered distinguishable from sale of memberships in an ongoing operation. There was a substantial risk the venture would not succeed. Although profits were not returned in the form of cash, the court stated that members received profits from increased facilities, a more valuable membership, and a continuing club. A holding otherwise, the court reasoned, would permit easy subversion of the purposes behind the Act, protecting investors from spurious schemes to attract capital. The court implies by this holding that where an ongoing business is involved, there is no imperative need for the protections of security acts, and those businesses should not be included.

Following the *Sobieski* case, the attorney general of California opined that franchises should be considered as securities in some circumstances. Included in that category are franchises where the franchisee participates only nominally in exchange for a share of the profits, and those where the franchisee participates in actual operations and the franchisor secures provision of necessary services by fees derived from the sale of

the franchise. 49 Ops.Cal.Att'y.Gen. 124 (1967). The attorney general justifies inclusion of the latter group by distinguishing two forms of investment. One is investment by the franchisee in his local operation. Since the franchisee is presumed to control the profitability of his business, there is no need to protect him in this sense. The second is investment of risk capital in the franchisor's business to insure a steady supply of goods and services. The attorney general argues that this is in actuality a form of profit and that the franchisee is a passive investor to whom the protection of security laws should extend.

While we consider the "risk capital" analysis appropriate in some instances where franchises are involved, we also recognize the peculiar nature of franchises is such that they cannot be as easily categorized or analyzed as other security interests. We also realize that the franchisor's success and reputation depend upon the performance, qualitative and quantitative, of the local franchisee's operation. For that reason, the attorney general's pronouncements must be considered too extreme. We believe the import of *Sobieski* and the better view would limit the 1933 Act to situations where exceptionally high risk, speculative franchises are involved. *See* Note, Regulation Under the California Corporate Securities Law, 5 San Diego L.Rev. 140 (1968). In other situations, we consider the risk undertaken by the franchisee as incident to the conduct of his business.

Mr. Steak, Inc., has not been shown to be a poorly-financed or speculative business venture. With over two hundred successful franchises quite the converse was true, and River City Steak's prospects for success appeared good. Defendant assured itself a supply of necessary food products independently of Mr. Steak, which specified products, available from suppliers other than itself, that were to be used in restaurant operations. Given the initial costs, including construction, incident to opening the restaurant, and excluding accounting services of dubious value supplied by Mr. Steak, we think it fair to conclude that River City Steak, Inc.'s, investment in plaintiff's business comprised the purchase of the Mr. Steak name and method of doing business. Any "risk" to River City Steak created by that purchase is an insubstantial and legitimate risk of doing business. That risk does not warrant investor protection, and so under our analysis, no security interest subject to registration and regulation under the 1933 Act has been created.

Our conclusion is supported by weighty considerations. The registration provisions of the 1933 Act are ill-suited to fostering disclosure of information relevant to prospective franchisees. We note that the Securities and Exchange Commission has been given broad discretion by federal courts to define the public interest. *E. g.*, Marketlines, Inc. v. S. E. C., 384 F.2d 264, 267 (2nd Cir. 1967) cert. denied 390 U.S. 947, 88 S.Ct. 1033, 19 L.Ed.2d 1137. Mr. Loomis, general counsel for the Commission, indicated in a statement before the Subcommittee on Urban and Rural Economic Development of the Select Committee on Small Business that, while it finds some form of regulation desirable, the Securities and Exchange Commission considers franchises beyond the scope of the 1933 Act. In view of the Commission's position, the complex problems involved and the impact of this industry on our national economy, we agree that judicial imposition of the 1933 Act upon the sale of franchised businesses may be inappropriate. Such a step should properly be taken by the Congress or state legislatures.

The Securities Exchange Act of 1934 is considered to be *in pari materia* with the Securities Act of 1933, and is intended to cover similar security interests. Brown v. Gilligan, Will & Co., 287 F.Supp. 766 (S.D.N.Y.1968). For reasons similar to those expounded above, we find that plaintiff's franchise operation is not within the scope of the 1934 Act. Because the Colorado Licensing and Practice Act, CRS, ch. 125 (1963),

adopts a definition of security that closely parallels the 1934 Act, we find it likewise inapposite.

We find that defendant River City Steak has failed to state a claim upon which relief can be granted in counterclaims four through seven.

It is therefore

Ordered that plaintiff Mr. Steak's motion to dismiss said counterclaims be and the same hereby is granted.