William H. WIEBOLDT, Jr., Plaintiff,

v.

M. Stanley METZ et al., Defendants.

No. 70 Civ. 3237.

United States District Court,
S. D. New York.

Feb. 22, 1973.

Lipkin, Gusrae & Held, New York City, for plaintiff.

Zucker, Weiden & Shapiro, New York City, for defendant Benjamin Dorskind.

Weil, Gotshal & Manges, New York City, for defendant Stevens H. Weiss.

Vineski, Brann & Williams, Troy, Pa., for defendants Franklyn P. Bolton and Roy Stuckless.

## OPINION

LASKER, District Judge.

Enticed by an ad in The New York Times promising "the best of all business worlds", plaintiff, William Wieboldt, purchased from Simplified Business Services ("SBS") for $12,500 a franchise to operate a Simplified Business and Tax Center. He also acquired 1,500 SBS shares at $2.50 per share. Wieboldt's investment was not as lucrative as he had hoped, a fact which eventually led him to bring this suit against SBS, some of its officers and directors and its advertising agency. The two corporate defendants are now bankrupt.

The thrust of the complaint is that the franchises purchased by Wieboldt and others were investment contracts which defendants failed to register before sale with the Securities & Exchange Commission ("S. E. C."), as required by the Securities Act of 1933, and sold by means of fraudulent misrepresentations in violation of the Securities Exchange Act of 1934 and the common law. A corollary to this theory is that the sale of SBS common stock was unlawful because the registration statement covering it failed to indicate that SBS's activities in connection with the sale of the franchises violated the securities laws.

Defendants, Weiss and Dorskind, directors of SBS, move to dismiss the complaint on the ground that the franchises are not securities and their sale is not subject to the Acts. Alternatively, they move to strike certain portions of the complaint and the demand for punitive damages.

Whether Wieboldt's franchise is an investment contract is the central issue in the case. An examination of the master franchise agreement (attached to stipulation of October 2, 1972) indicates beyond doubt that it is not.

The agreement provides that the purchaser of the franchise is to operate, under the supervision of SBS, a simplified business and tax center within a given area. In return for assistance in establishing the center and training, SBS is to receive 10% of annual gross sales. Furthermore, five satellite franchises are to be established within the territory under the authority of the franchisee. The essential nature of the agreement and the language of the contract[1] demonstrate plainly that both SBS and the

---

1. The master franchise agreement reads as follows,

"This will confirm our agreement as follows:

1. We hereby grant you a franchise to own and *operate* a Simplified Business and Tax Center in the territory described in Schedule 'A'. In addition to *your own operation* of a Simplified Business and Tax Center it is understood that within your aforesaid territory *there shall be at least five Satellite Franchises under your authority* as herein set forth.

* * * * *

5. We shall be paid *by you* an annual royalty of ten (10%) percent of *your* annual gross sales.

* * * * *

8. Within the area of your franchise it is both our intentions that there will be a minimum of five additional Tax Centers which will be hereinafter referred to as Satellites. It is agreed that *either of us* will have the right to establish a Satellite Franchise Tax Center within your area.

franchisee are intended to have an active role in carrying out its terms. This fact distinguishes the master franchise from other arrangements which have been found to be investment contracts for purposes of the securities laws.

An understanding of the nature of investment contracts begins with the often cited Supreme Court cases, S. E. C. v. C. M. Joiner Leasing Co., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) and S. E. C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). *Joiner* held that, to determine whether an agreement is an investment contract, it is not sufficient to look at what it is labeled or appears to be; "[t]he test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." 320 U.S. at 352–353, 64 S.Ct. at 124. Subsequently, *Howey* articulated what implicitly underlies the *Joiner* decision: namely, the definition of an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298–299, 66 S.Ct. at 1103. This definition reflects the underlying facts in both Supreme Court cases: That the purchasers were numerous, scattered in area and devoid of training or opportunity enabling them to participate actively in the enterprise. As a result, the profit-making potential of the investment was realizeable only by the promoters or by third parties who, unlike the purchasers, were in a position effectively to control the operation of the enterprise. Accordingly, the purchasers were mere passive investors and the sale of the investment contracts gave rise to "all the evils inherent in the securities transactions which it was the aim of the Securities Acts to end." *Joiner, supra,* 320 U.S. at 349, 64 S.Ct. at 123.

The opposite is true here. Unlike *Joiner* and *Howey*, the situation here does not involve numerous, scattered, ignorant investors. On the contrary, SBS sold only eight franchises such as plaintiff purchased. (Charles Affidavit, par. 3.) The franchisees were given designated franchise areas which were to be under their personal supervision. Although no prior experience was required of them, the contract anticipated that they would receive, at the hands of SBS, the training necessary to conduct the business. In short, as noted above, active participation by the franchisees in operating the business was provided for by the terms of the franchises. Accordingly, the agreement here does not meet the *Howey* test that "the scheme involves an investment of money in a

* * * * *

You shall have the initial expense of setting up the Satellite's office. Your approval must be given to the holder of the Satellite Franchise which approval will not be unreasonably witheld.

* * * * *

9. We may by written notice to you terminate this agreement and your franchise upon the happening of any of the following events.

    a. *You shall fail to operate* your Franchise and Tax Center in accordance with our standarized systems and operational methods.

    b. You shall fail to make timely payments of the monies due to us under the provisions of this agreement.

    c. You shall violate any material Federal, State or Local statute.

* * * * *

10. *You shall* have the right to *use* the names Simplified Business services and Simplified Tax Services in connection with *your operation* and to sell and use Simplified's Systems and services in connection therewith.

* * * * *

11. *You shall be responsible* and pay all costs and expenses in connection with and/or relating to the operation of your Franchise and Tax Center as aforesaid. We shall not be responsible for any of the foregoing.

* * * * *

14. It is understood that *you are an independent contractor* and that we are not partners, joint venturers, or agents or employees." Exhibit to stipulation of Oct. 2, 1972 (emphasis added).

common enterprise with profits to come *solely from the efforts of others.*" 328 U.S. at 301, 66 S.Ct. at 1104 (emphasis added). On the contrary, the master franchise agreement contemplates that profits, if any, will be derived primarily from the efforts of the franchisee.

Thus, unlike *Joiner* and *Howey,* in which the Court found the agreements to be investment contracts, the instant case closely resembles the facts in Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635 (9th Cir. 1969). Like Wieboldt, Chapman was moved by optimistic advertising to purchase a franchise. Referring to the distributionship as a "'Turn-Key' operation into which the investor merely steps," the brochure which sold Chapman on the deal minimized the efforts of the franchisee and maximized those of the franchisor. *Id.* at 641. The promotional material even used terms such as "investor," "investment," "investment requirement" and "investment schedule". *Id.* at n. 6. However, the agreement itself, on its face, required active efforts on the part of the franchisee, and the court, therefore, declined to find the existence of a security.

The facts in *Chapman* closely parallel Wieboldt's involvement with SBS. Wieboldt's interest was first engaged by a newspaper ad describing the business opportunity in glowing terms and containing the paragraph:

"IDEAL ABSENTEE-OWNERSHIP or INVESTMENT OPPORTUNITY TOO! If you are looking beyond ownership/management only, let us show you the unique advantages this dynamic business offers to those interested in investment, and/or absentee ownership." Exhibit A to Wieboldt affidavit.

However, apart from this paragraph, the ad speaks in terms of active participation: "You will have under your direct supervision at least five 'satellite' franchises;" "now is the time to establish yourself . . . [and] build a future in this booming field." *Id.* Furthermore, the language and terms of the actual agreement are incompatible with the notion that the franchisee is a passive investor.[2] Although it also provides for an active role for SBS, that part was to consist primarily of providing equipment, training and supervision to the franchisee. As *Chapman* observes, "the very fact that [the agreement] emphasizes the amount of assistance the company will provide implies that the distributor is also to contribute an effort." 409 F.2d at 641. We see no distinction between *Chapman* and the instant case.

Wieboldt, in fact, basically concedes that, following the mainstream of cases discussed above, his franchise could not be considered an investment contract. However, he urges the adoption of a "liberalized and broadened concept" of investment contracts (Plaintiff's Memorandum at 20) based on the "risk capital" test. Although this approach, which derives from the well-known California case, Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961), is clearly an expansion of the traditional definition of an

---

2. Of course, "[t]he Securities Act prohibits the offer as well as sale of unregistered, non-exempt securities. Hence, it is enough that respondents merely offer the essential ingredients of an investment contract." SEC v. W. J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). We do not think, however, that the ad run by defendants constituted such an offer. As noted above, its primary emphasis is on active participation by the prospective franchisee. The offending paragraph which offers "absentee-ownership" and "investment opportunity" is not enough to change the basic characterization of the franchise. Furthermore, that paragraph does not make an offer to sell, but proposes to "show" the reader what the investment possibilities in the field are. Accordingly, the ad is not an offer of a security under the 1933 Act.

investment contract, Wieboldt maintains that it is not incompatible with it.[3] Moreover, he persuasively argues that its adoption would be in keeping with the fundamental purposes of the Acts.

Broadly speaking, according to the "risk capital" approach, a franchise is a security if the franchisee's monetary contribution to the enterprise constitutes part of its initial capitalization, while his personal participation in its activities does not give him any effective control over it. The theory behind the test is that, under those circumstances, the profit-making potential of his investment is essentially realized by the franchisor and the *Howey* test that "profits [are] to come solely from the efforts of others" (328 U.S. at 301, 66 S.Ct. at 1104) is satisfied.

The basic "risk capital" approach has not received uniform application. One commentator seems to have concluded from it that, since "a franchisee could not exist without the success of the entire common enterprise franchise system, which is operated and controlled solely by the franchisor, and, furthermore, that the franchisee's profits depend thereon," all franchises should be treated as securities. B. Goodwin, Franchising in the Economy: The Franchise Agreement as a Security under Securities Acts, Including 10b–5 Considerations, 24 The Business Lawyer 1311, 1319 (1969). This approach was rejected by Mr. Steak, Inc. v. River City Steak, Inc., 324 F.Supp. 640, 646 (D. Colo.1970), aff'd, 460 F.2d 666, 670–71 (10th Cir. 1972). We agree that its

adoption "would work an unwarranted extension of the Securities Act." 324 F.Supp. at 646.

On the other hand, the original exponent of the "risk capital" test, the California Attorney General, has, on the basis of *Silver Hills*, distinguished three types of franchises:

"1. Where the franchisee participates only nominally in the franchised business in exchange for a share of the profits.

2. Where the franchisee participates actively in the franchised business and where the franchisor agrees to provide certain goods and services to the franchisee.

3. Where the franchisee participates actively in the franchised business and where the franchisor agrees to provide certain goods and services to the franchisee, but where the franchisor intends to secure a substantial portion of the initial capital that is needed to provide such goods and services from the fees paid by the franchisee or franchisees." 49 Ops. Cal.Atty.Gen. 124 (1967).

Under the California approach, types 1 and 3, but not 2 constitute securities. *Id.*

As to type 3, which we shall call the "initial capitalization" approach, it is clear from the analysis accompanying the Attorney General's opinion that the initial capital referred to is the franchisor's not the franchisee's. R. W. Jennings and H. Marsh, Securities Regulation (2d ed.) 254 (1968).[4] This follows

---

3. See Goodwin, Franchising in the Economy: The Franchise Agreement as a Security Under Securities Acts, Including 10b–5 Considerations, 24 The Business Lawyer 1311, 1319 (1969): "It is submitted that franchising, when realistically considered with a true understanding of that business, comes under the *Howey* rule."

4. The analysis reads: "This step [example 3 of the opinion] focuses upon the fact that the franchisee provides the initial capital needed by the franchisor."

Jennings and Marsh, *supra*, at 256. It states further: "If a franchisor solicits fees from his franchisees in order to raise a substantial portion of *his* initial capitalization (i. e., the 'risk capital'), the analogy to the *Silver Hills* fact situation is complete." *Id.* at 257 (emphasis added). The analysis concludes on this point: "Finally, it is not clear what degree of under-capitalization by the franchisor will cause the fees paid by the franchisee to be characterized as 'risk capital' within the *Silver Hills* rule." *Id.*

logically from the fact that the question for decision is what type of investment the franchisee is making in the franchisor's operation. However active the franchisee may be with regard to his franchised business, if the price he pays for it contributes to the franchisor's initial capital, he may be considered a passive investor as to the latter. As the analysis of the California Attorney General states:

"Following this reasoning, it would seem that the franchised business operated by the franchisee and the franchisor's business of supplying the franchisee with goods and services are separate 'business ventures' and that the venture in which the franchisee participates is not the same venture for which he supplies the risk capital." Id. at 258.

This approach was viewed with favor in Mr. Steak, but its application was limited by the court "to situations where exceptionally high risk, speculative franchises are involved." 324 F.Supp. at 647.

Finally, S. E. C. v. Glenn W. Turner Enterprises, Inc., 348 F.Supp. 766 (D. Or.1972), (the case most heavily relied on by Wieboldt), reflecting type 1 of the opinion of the Attorney General, emphasizes yet another factor: "[W]hether or not the investor has substantial power to affect the success of the enterprise." Id. at 775. The court concluded that, although the franchisee may be extremely active in the business, his investment may still be a security if his activities are of a ministerial nature only, since "[i]n applying the Supreme Court's definition of an investment contract, . . . the efforts of others which are relevant for purposes of the

definition are those essential managerial efforts which affect the failure or success of the enterprise." Id.

In this regard, we think it is only necessary that the franchisee exercise policy-making power over his unit of the enterprise, since to require control over the franchisor's entire system is incompatible with the franchising method and would make all franchises investment contracts. We disagree with Goodwin's conclusion that the success of a franchised business depends ineluctably on that of the entire franchise system of which it is a part. In the case of many, if not most franchises, like the franchise in Mr. Steak, the "[franchised] enterprise stands or falls independently of the [franchisor's] success or failure." 324 F.Supp. at 645. At the very least, the typical franchise gives the franchisee sufficient input into decisions which determine his enterprise's economic viability to distinguish him from the passive investor protected by the Acts. Id. Only franchise agreements, like those found in Turner, which give the franchisee no meaningful control over his own enterprise (or, of course, that of the franchisor) should be considered investment contracts within this interpretation of the "risk capital" approach.

We agree with Wieboldt that the security concept "embodies a flexible rather than a static principle" (Howey, supra, 328 U.S. at 299, 66 S.Ct. at 1103) and that the "risk capital" test provides useful input into defining "security" in relation to the use of franchising to finance business enterprises. However, we do not conclude, as a result, that the franchise which he purchased is a security under the "risk capital" test. It is

---

at 258. See also Goodwin's analysis of this approach:

"The idea of 'risk capital' becomes especially important if the franchisor needs such excess franchise fees (whether denominated as a nonreturnable advance against royalties to be paid by the franchisee, or as a fee paid by the franchisee to use the franchisor's

trademark or trade name, or otherwise defined) to finance the start of the franchise system, including the supplying of necessary locations, goods, services, equipment, furniture, furnishings or supplies to the franchisee, for the obvious benefit of the entire common enterprise of the franchise system." 24 The Business Lawyer at 1320.

not necessary for this purpose to decide which, if any, of the elements discussed above—capital contribution, risk, or lack of high level decision-making power—is the essential one. Under any of the approaches (barring, of course, Goodwin's absolutist position), Wieboldt's franchise is not a security.

 First, what evidence there is indicates that SBS was in operation since at least the early 1960s. The complaint speaks of an FTC order against SBS in 1962 (par. 21(b)), and the affidavit of Lincoln Charles, Vice President of SBS, reveals that at least 35 franchises (of a different type) were in existence during the 1960s (par. 3). Thus, Wieboldt's $12,500, although it may have been used in part to purchase the equipment which SBS was obligated to give him, can hardly be considered part of SBS's initial capitalization. Second, a business which provides bookkeeping, management and data processing services along with individual tax return preparation is not what would typically be considered a high risk enterprise.

Finally and, we think, most importantly, Wieboldt's given role was not essentially ministerial, but truly active and discretionary. As to his franchise area, the agreement gave him virtually unfettered control, a situation which is irreconcilable both with *Howey*'s definition of an investment contract and with the "risk capital" variation on the *Howey* test.

Accordingly, the franchise purchased by Wieboldt was not an investment contract, and its offer and sale were not covered by the Acts. Since Counts One and Two, which state Wieboldt's federal claims, are entirely dependent on the contrary proposition, they must be dismissed. The pendent common law claims (Count Three) must also be dismissed under the rule enunciated in United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), which holds that "if the federal claims are dismissed before trial, even though not insubstantial

in a jurisdictional sense, the state claims should be dismissed as well." *Accord,* Rogers v. Valentine, 306 F.Supp. 34, 40 (S.D.N.Y.1969), aff'd, 426 F.2d 1361 (2d Cir. 1970). The complaint is dismissed.

It is so ordered.