NASH & ASSOCIATES, INC., et al.,
Plaintiffs-Appellants,

v.

LUM'S OF OHIO, INC., et al.,
Defendants-Appellees.

No. 73-1049.

United States Court of Appeals,
Sixth Circuit.

Argued June 8, 1973.

Decided Sept. 5, 1973.

Charles E. Pierson and Daniel G. LaPorte, Akron, Ohio, on brief, for plaintiffs-appellants.

James B. Koplow, Cleveland, Ohio, on brief, for defendants-appellees.

Before PHILLIPS, Chief · Judge, LIVELY, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

PHILLIPS, Chief Judge.

Appellant Nash and Associates, Incorporated (Nash) brought suit on September 21, 1971, against Lum's of Ohio 283 Corporation, Lum's Incorporated (Lum's) and Full Disclosure Sales, Incorporated (Full Disclosure)[1] alleging fraudulent statements and omissions in connection with the offer and sale of a fast food restaurant franchise. Suit was brought under §§ 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77l(2) and 77q(a) and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); also under Rule 10b–5 promulgated under the latter statute. Additionally pendent jurisdiction was asserted for common law fraud and for violations of the Ohio blue sky laws.

On December 3, 1971, Lum's moved for dismissal on the ground that the complaint failed to state a claim upon which relief could be granted or in the alternative for summary judgment. Rules 12(b)(6) and 56, Fed.R.Civ.P.

Both parties filed affidavits. On August 23, 1972, District Judge Thomas D. Lambros held that the franchise package did not constitute a security under either federal act. Pendent jurisdiction over the state issues was declined and the suit dismissed.

Full Disclosure never filed an answer to the complaint and a default was entered by the Clerk. The District Court denied Nash's application for the entry of a default judgment on the ground that Lum's defense of lack of federal subject matter jurisdiction inured to the benefit of the defaulting party. On this appeal Nash asserts that the District Court erred in holding that neither the initial offer nor the actual franchise agreement constituted securities under the federal statutes. It is further urged that the District Court erred in declining pendent jurisdiction over the state law claims and in not entering a default judgment against Full Disclosure.

We affirm.

■ Viewing the affidavits submitted by the parties in the light most favorable to the appellant, we agree with the District Court that there are no genuine issues of material fact. Rule 56, Fed.R.Civ.P. We find that the initial offer and the actual agreement envision nothing more than a traditional franchise agreement. As such the arrangement is beyond the scope of the federal securities legislation. Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635 (9th Cir. 1969); Wieboldt v. Metz, 355 F. Supp. 255 (S.D.N.Y.1973); See, Note, 33 Ohio St.L.J. 718 (1972).

In 1968, the Nash promoters became interested in obtaining a Lum's restaurant franchise in the Akron, Ohio area. The promoters were encouraged by Lum's Ohio sales agent, Full Disclosure, to visit the franchisor's corporate headquarters in Miami, Florida. At that time they were exposed to a new restaurant franchise being promoted known as Abner's Beef House. After speaking to various sales agents and reading the com-

1. At the time of the transaction giving rise to this suit, Full Disclosure was operating under the name of E.C.K. Chivers & Associates, Incorporated.

pany's literature, Nash decided to purchase an Abner's franchise.

Nash selected a manager, who was trained by Lum's, and the restaurant opened in February of 1970. Within three months thereafter, Lum's decided to discontinue its Abner's operations. Thus the anticipated national advertising campaign did not materialize and Nash failed to prosper.

Nash brought this suit to rescind the franchise agreement and to recover its expenses. The central issue is whether either the offer or the agreement constitutes an investment contract and therefore a security under the federal statutes. An examination of the affidavits and the agreement convinces us that it is not.

At the time the parties began their negotiations, Lum's was a solvent and well established owner, operator, and franchisor of fast food restaurants. The corporation had over 200 restaurants open and had gross sales of over $27,000,000. It is clear that the franchisor was to provide a great deal of assistance to the franchisee and this fact is stressed in Lum's promotions. However, although the assistance was to be extensive, it also is clear that nothing more than assistance was contemplated and that the ultimate responsibility for local success rested with the franchisee.

The franchisee was to select a site and this location was subject to the approval of Lum's. Had the franchisee desired assistance in locating a site, the franchisor agreed to provide it. After a site was agreed upon, the franchisor agreed to provide architectural plans, including adaptations to meet local requirements. The plan also called for Lum's originally to lease the building and then sublease it to Nash.

Lum's further agreed to train the franchisee and his employees and to provide a special crew to operate the restaurant for the first two weeks. Extensive bookkeeping and advertising services were also promised.

In return for these services and the use of the Abner's name, the franchisee agreed to pay $15,000 in franchise and development fees. The franchisee was also bound to purchase an equipment package from the franchisor for $34,000 or to purchase an equivalent. Monthly rental was $1,641.67 plus 5% of gross sales. An additional 2% of gross sales was to be paid into an advertising account. Further an Abner's franchisee was required to meet certain quality standards in products, accessories, and building maintenance. A prescribed amount of insurance had to be carried and financial reports filed. In addition Nash was required to send at least three employees to the franchisor's training school.

While neither the Securities Act nor the Exchange Act specifically include franchise agreements within their definition of a security, both include investment contracts. § 2(1) of the Securities Act, 15 U.S.C. § 77b(1) and § 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10). It is the contention of Nash that its agreement constitutes an investment contract.

In determining whether a particular transaction qualifies as an investment contract the treatment afforded a transaction will not turn on the title employed by the parties. The courts will look through form to economic reality in light of the entire transaction. S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); See, Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). The term investment contract was defined by the Supreme Court in S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) as:

> "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. . . ." 328 U.S. at 298–299, 66 S. Ct. at 1103.

While *Howey* dealt with an investment contract under the Securities Act, the

definition is equally applicable to the Exchange Act. Tcherepnin v. Knight, *supra*.

*Howey* emphasized the need for flexibility in examining a potential investment contract in order to, "meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 299, 66 S.Ct. at 1103.

The major stumbling block for franchisees attempting to employ the protection of the securities statutes has been the *Howey* requirement that profits are to come *solely* from the efforts of others. In the traditional franchise arrangement the franchisee manages the local business and it therefore can not be said that his return comes *solely* from the efforts of others. However even in those situations where the franchisee has had virtually no control over the local operation, some courts have refused to declare the agreement an investment contract. *See*, Mr. Steak, Inc. v. River City Steak, Inc., 324 F.Supp. 640 (D.Colo.1970), aff'd, 460 F.2d 666 (10th Cir. 1972).[2] *See also*, S.E.C. v. Koscot Interplanetary, Inc., CCH Fed. Sec.L.Rep. ¶ 93,960 (N.D.Ga.1973).

In response to the definitional difficulties under the *Howey* requirements, some authorities have advocated a less restrictive approach. The Ninth Circuit recently found an investment contract in a situation where the investor was required to perform some personal services. The Court distinguished the investor's nominal duties from those managerial services necessary to determine the ultimate success or failure of the enterprise. S.E.C. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476 (9th Cir. 1973). California authorities would consider an enterprise to involve an investment contract when the investor's capital is subject to the risks of the promoter's business. *See*, Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961). *See also*, 49 Ops.Cal.Atty.Gen. 124

(1967). Still other authorities would require an investor to demonstrate both lack of managerial control and the subjection of the investment to the risks of the promoter's business. State v. Hawaii Market Center, Inc., 485 P.2d 105 (Hawaii 1971); S.E.C. Securities Act Release No. 5211, Exchange Act Release No. 9387 (November 30, 1971). The latter position was applied by the same District Court that had previously issued the *Mr. Steak* opinion. Venture Investment Co., Inc. v. Schaefer, 3 Blue Sky L.Rep. ¶ 71,031 (D.Colo.1972), aff'd on other grounds, 478 F.2d 156 (10th Cir. 1973).

█ We find the general concept of less restrictive approach attractive in view of the broad remedial purposes of the federal legislation and the importance of flexibility as stressed in *Howey*. However we need not now set forth the extent to which this Circuit would apply any of these theories. Here it is apparent that the franchise before us would not qualify as an investment contract under any of these positions. We therefore postpone establishing criteria until we are presented with a factual situation requiring it.

In the present case the contested agreement has none of the traditional qualities of a security. The franchisor is adequately capitalized and the franchisee is in control of his own business. This situation is not within the scope of either the Securities Act or the Exchange Act. Nash has invested in its own business. It has purchased the right to use a name and to receive many specialized services. Nor can it be said that a multimillion dollar franchisor was in need of the appellant's fees for its initial capital or that Abner's was a highly speculative venture.

██ Accordingly we hold that neither the offer nor the actual franchise agreement constituted an investment contract. Therefore the judgment of the District Court on the federal securities claims is affirmed. As the federal

---

2. The *Mr. Steak* decision is more extensively reviewed in 24 Vand.L.Rev. 638 (1971).

issues were dismissed before trial, the District Court's decision to decline pendent jurisdiction over the state issues was also proper. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). This court further holds that the District Court did not abuse its discretion in refusing to enter a default judgment against Full Disclosure.

Affirmed.