Sam **BITTER** et al., Plaintiffs-Appellants,

v.

**HOBY'S INTERNATIONAL, INC.**, a corporation, et al., Defendants-Appellees.

Sam **BITTER** et al., Plaintiffs-Appellants,

v.

The **ARIZONA BANK**, a corporation, Defendant-Appellee.

Nos. 72–1721, 72–1878.

United States Court of Appeals, Ninth Circuit.

May 8, 1974.

Rehearing Denied July 11, 1974.

Kenneth A. Winsberg (argued), Stephen T. Meadow, of Meadow, Cheche, & Thrasher, Phoenix, Ariz., for plaintiffs-appellants.

Henry Jacobowitz (argued), Phoenix, Ariz., for Hoby's International, and others.

John C. Ellinwood (argued), Phoenix, Ariz., for Ariz. Bank.

Before BARNES and CHOY, Circuit Judges, and SCHWARTZ,* District Judge.

## OPINION

SCHWARTZ, District Judge:

Appellants brought these actions for rescission and damages, alleging that the agreement for a hot roast beef restaurant franchise offered by appellees constituted an unregistered security under the federal security laws. The District Court rendered summary judgment against appellants. We affirm.

* Honorable Edward J. Schwartz, United States District Judge, Southern District of California, sitting by designation.

## I

Hoby's International, Inc. was incorporated in Arizona in December, 1967, by A. J. Roberts for the purpose of engaging in the hot roast beef restaurant franchising business. Its capitalization consisted of Roberts' contribution of $20,000.00 in equity. Subsequently, Roberts also contributed a $60,000.00 loan to Hoby's to finance building the company's model store, which opened in Phoenix during July, 1968. By November, 1969, Hoby's had serious financial problems and Roberts sold stock to an employee, had his own loan repaid and departed for Florida to run the company from there. During this same period, two key employees resigned. The corporation ceased operation in April, 1970.

The Hoby's franchises were publicly advertised and a total of three were sold. The first franchise was sold in 1968 to Adam Beef, which opened its restaurant in Scottsdale that December. Bitter purchased the second franchise with a $15,000.00 down-payment in May, 1969. However, he failed to obtain additional financing and his restaurant never opened. Holman purchased a franchise which opened in Tucson in January, 1970. The Arizona Bank is involved because it allegedly participated in the sale of these franchises.

The sole issue presented is whether the franchise agreements entered into by appellants constitute an investment contract, and hence a security under § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1) or § 3(a)(10) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78c(a)(10).

## II

Appellants contend that they retained no practical profit-influencing control over their respective investments because the franchise agreement imposed strict standards for operation, including standards for materials, merchandise, supplies, financial reporting, advertising and employee service, demeanor and appearance, as well as controls over hours of operation, advertisements, the paint-ing of the building and installation of vending machines. Failure to meet Hoby's standards could result in cancellation of the franchise. Nevertheless, the franchisee was to be responsible for the day to day management and operation of his own hot roast beef sandwich restaurant.

■ In S. E. C. v. W. J. Howey, 328 U.S. 293 at 298–299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court described two essential elements for an investment contract: (a) an investment in a common enterprise, and (b) reliance of the investor solely upon the efforts of the promoter or a third party to make the enterprise profitable.

In the context of a scheme involving pyramid contracts, this court recently held that a limited degree of investor participation, by way of introducing future prospects, was consistent with the definition of an investment contract. S. E. C. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476 (9th Cir. 1973), cert. denied 414 U.S. 821, 94 S.Ct. 117, 38 L. Ed.2d 53 (1973). In considering the purpose of the Securities Act of 1933, we held:

[T]hat in light of the remedial nature of the legislation, the statutory policy of affording broad protection to the public, and the Supreme Court's admonitions that the definition of securities should be a flexible one, the word "solely" should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities. Id. at 482.

We went on to adopt a different test:

[W]hether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise. Id. at 482.

■ Applying such standard, the focus here must be on the extent of participation the franchisee has under the

franchise agreement. In *Turner,* the purported success of the investment depended primarily upon the selling efforts of the Turner employees and distributors, and not on the slight efforts of the investors. By contrast, the efforts required of the Hoby's franchisee were qualitatively more substantial, entailing continuous operation of the restaurant, production and sale of roast beef sandwiches and related products, purchase of materials, merchandise and supplies from sources selected at his sole discretion, preparation of monthly operating statements, and employment of personnel to accomplish the foregoing.

The contractual restrictions on the discretion of the franchisee were designed merely to effectuate the purported benefits of standardization derived from participation in a restaurant chain. They did not render the franchisee's efforts nominal. In spite of regulation, each franchisee's active management was essential to the success of his retail restaurant. See Lino v. City Investing Co., 487 F.2d 689 (3rd Cir. 1973); Nash & Associates, Inc. v. Lum's of Ohio, Inc., 484 F.2d 392 (6th Cir. 1973); Wieboldt v. Metz, 355 F.Supp. 255 (S.D.N.Y. 1973); Mr. Steak, Inc. v. River City Steak, Inc., 324 F.Supp. 640 (D.Colo. 1970), aff'd, 460 F.2d 666 (10th Cir. 1972).

This is not to say that the relative profitability of the investment would not be influenced by the success of the franchisor. However, the individual restaurant franchise operation was an integral economic entity, which could obtain supplies from sources other than the franchisor, and its success was not dependent upon the success of the franchise system. See Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971); Wieboldt v. Metz, supra at 260. Hence, the failure of the franchisor would not necessarily doom the franchisee's investment. Cf. Mitzner v. Cardet International, Inc., 358 F.Supp. 1262, 1267–1268 (N.D.Ill.1973).

## III

Alternatively, appellants contend the franchise agreement was a security because the franchisor was inadequately capitalized and may have relied upon franchise fees to provide the initial capital needed to adequately operate the business. This "risk capital" definition of a security was developed in Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961). In that case a membership plan was established to finance a new country club. However, there was a substantial risk that the venture would fail because the country club was inadequately capitalized and would require additional memberships to survive. The California Supreme Court held the plan to be a security. Following the *Silver Hills* case, the California Attorney General indicated that he considered a security to be involved whenever an initially undercapitalized franchisor relies upon franchise fees to raise his initial capital. 49 Ops.Cal.Atty.Gen. 124 (1967).

We decline to adopt this view. As previously indicated, the franchise here is a relatively independent economic entity. The failure of the franchisor does not necessarily doom the success of the franchisee who significantly participates in the operation of the franchise. Such an individual franchise operator independently determines his own success or failure and is not the passive investor intended to be covered by the federal security laws. See Wieboldt v. Metz, supra. Therefore, Hoby's possible undercapitalization is not relevant.

## IV

Appellants finally contend that Hoby's offered an investment contract, even if it did not sell one. See *Howey,* supra at 301. They point to the advertising brochure offering absentee ownership:

> . . . If you are an individual seeking his own business to operate, or invest as an absentee owner, here is your key to financial success.

There is no experience required. We assist you every step of the way.

Read in the context of the entire brochure, it is clear that what was offered to the franchisee was the right to operate and control the franchise by his own effort, or through a manager of his own choice. See Chapman v. Rudd Paint & Varnish Company, 409 F.2d 635 at 640–641 (9th Cir. 1969).

Such a manager would not be a "third party", as contemplated in the *Howey* definition of an investment contract. For the manager to be a "third person" within the meaning of the *Howey* test, the manager must be outside of the direct and immediate control of the franchisee. See Mr. Steak, Inc. v. River City Steak, Inc., *supra* at 642–645; cf. Continental Marketing Corporation v. S. E. C., 387 F.2d 466 (10th Cir. 1967), cert. denied, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419.

The judgment of the District Court is affirmed.